# Exhibit 1

# Scott Turner's Report



# Truck Accident & Incident Experts, LLC

**14174 Charthouse Ct. Naples, FL 34114**

**844-974-1870**

**Date: June 3, 2024**

**Report by:** Scott L. Turner

**Prepared for:** Mitchell Hastings, Esq.
Morgan & Morgan
216 Summit Boulevard
Suite 300
Birmingham, Alabama 35243

**Case Caption:** John Ross v Knauf Insulation, Inc., et al

**Jurisdiction:** United States District Court; Middle District of Alabama; Eastern Division

**Cause/Case/Docket Number:** 3:23-CV-00284-RAH-SMD

**General Information:**

**Date & Time of Crash/Loss:** Friday June 11, 2021 / Approximately 7:30 AM CST

**Location of Crash/Loss:** At or Near 2810 East 13th Avenue, Cordele, Crisp County, Georgia

**Equipment Involved: Plaintiff:** Unknown

**Defendant:** N/A

**Motor Carrier USDOT Number(s):** 134697 (Heartland Express, Inc.)

**Motor Carrier Status:** Authorized for Hire

**Motor Carrier Rating:** Satisfactory

**Weather Conditions:** Fair Cloudy / Approximately 78 degrees Fahrenheit

**Road Surface Conditions:** N/A

**Posted Speed Limit:** N/A

1

**Natural Lighting Conditions:** Within the hours of Daylight

**Artificial Lighting Conditions:** N/A

## 1.0 Relative Persons and Organizations-

- ➢ Knauf Insulation, Inc. (hereinafter "Knauf"): Knauf is the shipper/manufacturer of the Insulation (articles of cargo) which professional CMV driver Ross was delivering from his CMV at the time of the subject incident.

- ➢ John Ross (hereinafter "Ross"): Ross is the Plaintiff; a professional CMV driver in the employ of Heartland who was injured in the incident that formed the basis of this lawsuit.

- ➢ Heartland Express, Inc. (hereinafter "Heartland"): Heartland was the Motor Carrier *employer* of professional CMV driver Ross at the time of the subject incident. Heartland is by FMCSR definition a Motor Carrier with FMCSA Interstate Operating authority engaged in Interstate Commerce.

- ➢ Eric M. Todd (hereinafter "Todd"): Todd was a warehouse employee of CABP in Cordele, Georgia who aided Ross on the day and time of the subject incident. Todd was present at the scene of the incident and provided sworn deposition testimony regarding the incident and CABP's procedures for offloading CMVs. Todd has knowledge of similar incidents previously occurring involving Knauf loaded CMVs.

- ➢ Cameron Ashley Building Products (hereinafter "CABP"): CABP operates the facility where professional CMV driver Ross was dispatched to deliver the load of insulation shipped and loaded by Knauf.

- ➢ Cody Weldon (hereinafter "Weldon"): Weldon is the Knauf Warehouse Manager who provided deposition testimony as to the warehouse operations of Knauf including the loading and securement of articles of cargo as well as sealing of CMV semi-trailers.

- ➢ John Pinckney (hereinafter "Pinckney"): Pinckney is a consultant employed by National Transportation Consultants, Inc. and is an author of a report in support of Defendant Knauf in regard to the subject incident.

- ➢ Brian McGrew (hereinafter "McGrew"): McGrew was the Distribution Center Manager for CABP on the day and time of the subject incident. McGrew provided sworn deposition testimony regarding CABP's procedures for offloading CMVs.

- ➢ Mark John Bjerke (hereinafter "Bjerke"): Bjerke was the Vice President of Purchasing and Category Merchants for CABP on the day and time of the subject incident. Bjerke provided sworn deposition testimony regarding interactions between CABP and Knauf both in advance of and after the subject incident.

## 2.0 Abbreviations and Acronyms-

➢ USDOT – United States Department of Transportation
➢ 49 CFR – USDOT, Code of Federal Regulations
➢ MCSAP – Motor Carrier Safety Assistance Program
➢ GVWR – Gross Vehicle Weight Rating
➢ AAMVA – American Association of Motor Vehicle Administrators
➢ Form OP-1 – FMCSA Form OP-1; Application for Motor Property Carrier and Broker Authority
➢ ICC – Interstate Commerce Commission
➢ FMCSA – Federal Motor Carrier Safety Administration
➢ FMCSR – Federal Motor Carrier Safety Regulations
➢ CMV – Commercial Motor Vehicle
➢ BOL – Bill of Lading
➢ NASI – North American Standard Inspection
➢ CDL – Commercial Driver's License
➢ OOS – Out of Service
➢ SMS - Safety Measurement System
➢ SAFER - Safety and Fitness Electronic Records
➢ BASICs - Behavior Analysis & Safety Improvement Categories

# Full Report

## 3.0 General Description-

In the morning hours of Friday June 11, 2021, Ross was opening the rear cargo doors of his CMV semi-trailer in preparation of the off-loading of the articles of cargo (insulation bats) at the Cameron Ashley Building Products (CABP) location in Cordele, Georgia. As Ross opened and attempted to secure the left-hand cargo door it was caught by a gust of wind causing the door to *Kite* after which the unsecure articles of cargo fell from the CMV semi-trailer onto Ross causing injury.

CABP employees who were present when the unsecured cargo fell from the CMV semi-trailer provided aid to Ross and notified local Emergency Service who responded to the scene of the incident and transported Ross to a local medical facility.

## 4.0 Assignment-

The undersigned has been requested to examine all the documents listed in the Document's Reviewed section of this report. Apply the knowledge, experience, and education along with

3

standards of care, and the FMCSR; draw on the universe of information collected and known by the undersigned to form a set of opinions regarding the applicability of the FMCSR and the standards of care as it pertains to shippers, Motor Carriers, CMVs and their professional CMV drivers involvement as to the subject incident that occurred on June 11, 2021, within Crisp County, Georgia.

By aforestated examination, determine if and how the shipper, Knauf, was causative and/or contributed to the subject incident in any way whatsoever, and in what manner from a regulatory, best practices and/or policies and standards of care standpoint.

## 5.0 Introduction and History-

The subject case is regarding an incident involving unsecure articles of cargo within a van style CMV semi-trailer which fell from the CMV upon the rear doors being opened, resulting in the CMV driver, who was securing the cargo doors in an open position at the time of the subject incident, being struck by the articles of cargo resulting in crushing type injuries to the CMV driver. This area of Cordele, Georgia is mostly commercial/industrial businesses.

_____

There is substantial evidence of which will be addressed in the following sections of this report with respect to the multiple proven causative and/or contributing factors to the subject incident with regard to the actions and/or inactions of Knauf and their employees regarding the securement of the articles of cargo within the Heartland CMV semi-trailer, such as failing to secure the articles of cargo with approved cargo securement equipment as would be the industry standard of care and/or best practice at a minimum.

It is foreseeable that a very real and predictable outcome exists when transporting articles of cargo which were not adequately secured. Whereas failure to secure the articles of cargo could present a risk of injury and/or death to persons performing offloading procedures, as in the incident forming the basis for this litigation, the significance of this responsibility is unequivocal. It is therefore that Knauf has a responsibility to ensure articles of cargo loaded at their facility within sealed CMV's is secured to prevent shifting and/or falling therefore avoiding such outcomes.

_____

Professional CMV driver Ross had been dispatched by his Motor Carrier employer Heartland, to transport approximately 660 (BOL) bags of insulation from the Knauf Insulation facility in Lanett, Alabama to Cameron Ashley Building Products in Cordele, Georgia.

Operating in a *drop and hitch* role professional CMV driver Ross coupled the prior loaded and sealed van style semi-trailer CMV to the Heartland CMV truck-tractor at the Knauf Insulation facility in Lanett, Alabama on the evening of June 10, 2021. Ross then proceeded to the

4

Cameron Ashley facility, arriving later that night. Arriving after business hours professional CMV driver Ross parked his CMV and slept/rested until the next morning.

Within his sworn deposition testimony, Weldon describes the process a CMV driver, such as Ross undergoes when picking up a loaded and sealed CMV semi-trailer at the Knauf facility in Lanett, Alabama: *Q: "Okay. So he comes, he's got a sealed trailer and he hooks up to that trailer and drives away. Is that generally the process?" A: "Once he picks up the paperwork, yes." Q: "Okay. So prior -- <u>but because it's sealed, he has no opportunity to inspect what's inside the trailer before he drives away, right?</u>" A: "<u>Correct.</u>" Q: "All right. Now, obviously <u>if he can't look inside the trailer, he can't know whether or not there's load straps or other safety equipment used, can he?</u>" A: "<u>Correct.</u>":* (CW: 107/1).

Professional CMV driver Ross gave sworn deposition testimony as to the occurrences of his arrival at Knauf and the direction he was provided by a Knauf employee on site: *Q: "Who did you talk to at Knauf when you got there?" A: "I don't know the gentleman's name. He was a black gentleman. I went up. There was another driver ahead of me so he took care of him, and then I told him who I was and what I was there for. And I had two load straps with me because the -- the dispatch required -- required me to supply two load straps. <u>And I had the two load straps with me, and -- and I presented them to him,</u> and <u>he told me that they already had some, that he didn't need them,</u> and that the trailer wasn't quite ready yet, <u>to go back out and wait in my truck.</u> And I left my phone number with him, and he said he would call me when it was ready. So I went back out to the truck and <u>I waited, I believe it was about an hour and a half.</u> And he called me and told me that the trailer was loaded and ready to come pick up the paperwork."*: (JR: 224/23; 02/28/2024).

It is of interest to note that Ross was directed to wait in his CMV while the Knauf employees loaded the CMV semi-trailer. It is most probable that this directive, in addition to the refusal of the Knauf employee to accept and use the load securement devices which Ross offered, enhanced Ross' reasonable expectation that the articles of cargo within the sealed CMV semi-trailer loaded by Knauf were adequately secured when he coupled it to his CMV truck-tractor. This in addition to the fact that, due to the trailer being sealed, professional CMV driver Ross had no opportunity to inspect the laden CMV semi-trailer for adequate securement of articles of cargo; therefore, Ross had no ability to discover latent defects of securement within the CMV semi-trailer.

Professional CMV driver Ross provides details of what entailed the next morning as he prepared the CMV for unloading and opened the doors in his signed *Answers to Interrogatories*:

> ➢ **Answer to Interrogatory #3 – Plaintiff's Answers to Interrogatories Propounded by Defendants;**
>
> *"As best I recall this was the first time I had ever picked up a load at Knauf. I picked up the trailer at Knauf's Lanett plant. <u>When I picked it up, the trailer was closed and sealed. Prior to it being sealed, I had not had any opportunity to inspect how the cargo in the trailer was stacked or secured.</u>*

*When it was time to unload the trailer, I pulled the trailer about 50 or so feet from CABP's loading doors. A CABP employee came out and reviewed the bill of lading. He then told me to break the seal on the trailer, back up to the loading dock, and to start unloading. He then went over to a flatbed truck that was also in the area. Following his instructions, I broke the seal on the trailer.*

*I was standing on the ground. I initially looked to make sure that the doors were not bulging or for other signs that the cargo might be pressing on the door. Everything appeared okay. After making sure that it was safe to open the doors, I stood behind the left door (if facing the trailer), and, and opened the trailer's right door. I stood behind the left door because there is a latch/lock that prevents the left door from opening/moving when you open the right door, and if anything fell I would be shielded from the falling cargo and from the right door swinging out. <u>The stacked cargo was not completely flush, but it otherwise appeared stable.</u> I continued opening the right door by walking around to the side of the trailer. I then secured the right door by walking it around to the side of the trailer. I then secured the right door to the side of the trailer so it would not swing. After securing the right-side door, I again determined that it was safe to stand in front of the cargo on the right side so I could inspect the cargo on the left. While standing to the right, I looked at the cargo on the left/the left door to make sure it was safe to open the left door. <u>The stacked cargo on the left was not perfectly flush, but it appeared similar to the cargo on the right. It did not appear to be a fall risk based on what I saw. It was not leaning against the left side door. It was not moving. I did not see any indication that it was a fall hazard.</u> I believed it was safe to open the left side door. I undid the latch with my left hand, and, because I am right handed, began using my right hand to walk the door around to secure it to the side of the trailer. When I began to move the door, the wind pushed the door and pulled me where I had my back to the cargo. As my back was turned, the insulation fell on me."*

(Underlined Emphasis by Undersigned)

Professional CMV driver Ross provided sworn deposition testimony to the *Mississippi Workers Compensation Commission* on August 2, 2022. Within his testimony, he again recalls the door opening process to include the same sequence of events: *Q: "Were you dropping a trailer?" A: "No, sir, they was -- I was backing in to a loading dock door. They was going to unload the trailer while I sat there." Q: "So you had already backed into the loading dock?" A: "No, sir. The guy came out and got my paperwork and told me what door to back into and I broke the seal and opened the passenger's side door. I stood on the driver's side door and opened the passenger's side door and swung it open and looked and everything was okay, so I went and I locked that door. I stuck my head in the back of the trailer and looked at the rest of the load and everything looked okay. Everything -- nothing was leaning against the door. And there was a little bit of a breeze blowing and I opened the driver's side door –" Q: "Real quick, and I apologize for interrupting." A: "Go ahead." Q: "I just want to make sure that I understand what we're talking about here. Now, when you're referring to passenger and driver's side doors, are you referring to the two doors on the rear of the trailer or are these actually on the side?" A: "No, sir, the rear of the trailer. I'm just referring to the side of the truck." Q: "Gotcha. Okay. I appreciate that. Yeah, that is a very clear way of explaining it, so I do appreciate that. I just*

*wanted to make sure that I understood you. So you broke the seal. The seal, is that in the middle of the two doors?" A: "Yes, sir." Q: "Okay. So you broke the seal and you were standing in front of the passenger's side door. Are you on the ground?" A: "I was standing in front of the driver's side door, and yes, sir, I was on the ground because that was the safest way to open the doors. If anything had shifted on the trailer, the driver's side door is still locked and, you know, keep you from getting hurt." Q: "Okay. So you're standing behind the driver's side door, you open the passenger's side door, you lean over, everything looks fine for that side. You then close that door, shift over to the passenger's side to open the driver's side door?" A: "I take that door and swing around to the side of the trailer and lock it to the trailer." Q: "The passenger's side?" A: "That side of the trailer is open." Q: "Okay. Gotcha. Go on from there after you lock the passenger's side door on the side of the truck." A: "Okay. Then I stick my head inside the trailer and I look at the driver's side of the load and everything looked okay. And I went ahead and I opened that door, and as it was -- as it was swinging out, the breeze caught a hold of it and I grabbed the door and it swung me backwards with my back to the trailer. And that's when four bundles of insulation came out of the trailer and hit me. One hit me in the back of the head and neck, and one hit me on the lower back and buttocks, and the other two hit me on the -- my legs and pinned my legs to the ground."*: (JR: 46/7).

On February 28, 2024, professional CMV driver Ross was again deposed wherein he testified to the door opening procedure he used the day of the subject incident. Within this testimony his door opening actions were described in the same sequence as the aforestated testimony and Interrogatory response provided by Ross.

Furthering his self- preservation through following industry best practices for opening CMV semi-trailer doors, professional CMV driver Ross provided testimony wherein he described the action of looking inside the CMV semi-trailer after opening the right-hand door to ensure there were no articles of cargo which had fallen and/or were resting against the left-hand door prior to unlatching and opening the left-hand door: Q*: "Okay. You looked -- after you opened the right door, you looked into the trailer on the right side before you fully opened the right side door; right?" A: "Yes." Q: "And you didn't see anything that looked like it was going to fall or pushing against the door?" A: "No."*: (JR: 252/20: 02/28/2024).

Ross also defined the difference between a *Live Load* and a *Sealed Load* in his sworn deposition testimony and stated he uses the same procedure to open the doors of his CMV semi-trailer regardless of whether it was a sealed semi-trailer or a *Live Load*: Q*: "Okay. You said earlier that you -- once it's sealed, you have no idea what's inside. What did you mean by that?" A: "Well, if it's a live load, they -- they load it. You're hooked up to it. You back a trailer into the dock. They load it. You pull it out. You get to visually look at the load. Somebody from inside the warehouse comes out. They ask you if the load's good. You tell them yes or no. They close the doors and they seal it. Okay? If it's a already sealed trailer, then you have not seen nothing inside that trailer. You have no idea how they've loaded that trailer. Because per DOT, you are not allowed to break a seal to look at the load. The only one allowed to do that is when the -- when the receiver tells you, "Break the seal." So when that's -- that trailer is sealed at the factory, you have no idea how that trailer is loaded. You have no idea if they've used the proper safety equipment. You have no idea what they've done. So you're putting your life, your job, your family in their hands."*: (JR: 207/11; 02/24/2024); and: Q*: "You walked through your understanding as to how to open trailer*

*doors. <u>Does opening the trailer door depend on the type of material or load that you're</u>*
*<u>hauling</u>?" A: "<u>No</u>. That would -- with me, that would have been the standard for any load that I -*
*- excuse me -- any preloaded trailer I picked up because I did not know what was behind them*
*doors." Q: "<u>Would you open it differently if it was a live load</u>?" A: "<u>No, I wouldn't</u>."*: (JR:
209/5; 02/24/2024).

(Underlined Emphasis by Undersigned)

After being struck by the articles of cargo falling from the CMV Ross summoned assistance
from a CABP employee (Todd) who retrieved Ross's cell phone from the CMV. Emergency
Services was notified and responded to the scene and transported Ross to Crisp Regional
Hospital in Cordele, Georgia.

Image #1 and Image #2 below depicts the rear of the Heartland CMV after the articles of cargo
(Insulation bats) had fallen onto professional CMV driver Ross:



**Image #1**                                        **Source: Discovery**



**Image #2**                                                                **Source: Discovery**

Todd is the CABP employee who first assisted professional CMV driver Ross by advising him to remove the seal, open the rear cargo doors, and reverse the Heartland CMV into the dock area of CABP for off-loading. Todd also was the signee of the BOL acknowledging the shipment had arrived at the CABP facility.

In his *Answers to Interrogatories* professional CMV driver Ross refers to a comment Todd made in regard to the unsecure articles of cargo within the Heartland CMV which indicated he had experienced problems with Knauf cargo falling from CMVs previously:

> ➢ **Answer to Interrogatory #5 – Plaintiff's Answers to Interrogatories Propounded by Defendants;**
>
>   *"After the insulation fell on me, I yelled, and the same CABP employee who signed the Bill of Lading hurried over to where I was. As soon as he saw the insulation had fallen he said something to the effect of "<u>I have told the warehouse they have to start strapping</u>*

*these loads or this was going to happen." I understood him to be referring to Knauf's warehouse."*

Additionally in Ross' deposition testimony to the *Mississippi Workers' Compensation Committee* Ross states the CABP employee who assisted him stated he had previously advised Knauf of the need to secure the articles of cargo when they were loaded at the Knauf facility: *Q: "So you signaled for somebody in the customer's store?" A: "Yes." Q: "Do you know the name of the person who came out?" A: "No, sir, I don't." Q: "What happened when they got out there?" A: "He came out and seen what was going on, and the first words out of his mouth was that he had told the company that loaded the trailer that they needed to start putting load straps on it or somebody was going to get hurt. And I asked him if he would get in the truck and get me my cell phone because I couldn't walk and I couldn't move my head or neck. And he got my cell phone and he asked me if I needed an ambulance, and I said yes and he called the 911."*: (JR: 51/23).

---

The CMV semi-trailer professional CMV diver Ross had coupled his assigned CMV truck-tractor to had been loaded and sealed by Knauf employees at their Lanett, Alabama facility. As aforestated in professional CMV driver Ross' *Answers to Interrogatories* (redundant): *"….When I picked it up, the trailer was closed and sealed. Prior to it being sealed, I had not had any opportunity to inspect how the cargo in the trailer was stacked or secured….."*

Due to the specific loading circumstances regarding the subject CMV semi-trailer (semi-trailer sealed, load straps refused, and Ross directed to wait in truck-tractor) it is highly probable the shipper, Knauf, accepts the burden and/or responsibility of adequate securement of the articles of cargo within the subject CMV semi-trailer. More specifically, regulatory guidance as well as industry standards of care and/or best practices provide that when a shipper seals the CMV semi-trailer their known responsibilities as to adequate cargo securement are heightened.

*FMCSR § 392.9* provides relief for CMV drivers transporting a sealed CMV semi-trailer:

> **FMCSR § 392.9 Inspection of cargo, cargo securement devices and systems.**
>
> **(b) Drivers of trucks and truck tractors.** *Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—*
>
>> **(4)** *The rules in this paragraph (b) do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its cargo or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.*

Weldon provides sworn deposition testimony that Knauf does seal the CMV semi-trailers loaded at their facility and Knauf did not take any initiative to secure the articles of cargo within the

subject CMV semi-trailer: *Q: "Okay. Explain -- I didn't understand the -- <u>how do you know that y'all sealed it</u>?" A: "The order -- loading end was when we finished loading the trailer. <u>The shipment completion time is when the driver picked the paper work up and left the lot with it.</u>" Q: "Okay. And so <u>by fact that the loading had ended before the shipment completion had occurred lets you know that it was Knauf that sealed the trailer?</u>" A: "<u>Correct.</u>"*: (CW: 105/10); and: *Q: "Okay. Is there ever an instance where -- well, let me -- let me ask that again. As warehouse manager, <u>has there ever been an instance where Knauf has used load straps to secure a load where the customer didn't ask for it</u>?" A: "<u>No.</u>" Q: "Okay. And same question, but for load bars. <u>Has there ever been an instance where -- where y'all have used load bars to secure a load even though the customer didn't ask for it</u>?" A: "<u>No.</u>"*: (CW/116/3).

It is of interest to note that Knauf received several complaints from their customers prior to the day of the subject incident wherein the customer voiced concerns regarding the securement of the articles of cargo within a CMV semi-trailer. In fact, there were 24 documented customer comments/complaints dating back to August of 2019, regarding cargo securement included within Discovery. Weldon provides sworn deposition testimony stating that without prior customer requests for load securement these complaints are unjustified: *Q: "Okay. So something like this comes to the -- so do you receive this specific description?"  A: "Yes." Q: "How do you interact with this?" A: "The process in which I do any service claim is I'll pull the pick list, and at the end of the day, <u>if the customer did not request on the pick sheet, load securement, then I unjustify it</u> and send it back to corporate."*: (CW: 258/17).

As detailed below *FMCSR § 392.9* contains regulatory guidance language which requires the shipper to take specific steps to ensure to the Motor Carrier and/or professional CMV driver that the cargo is secure. While there is no indication in Discovery which, if any, of these specific actions outlined in the FMCSR were taken by Knauf, both Weldon and professional CMV driver Ross concur that the subject CMV semi-trailer was sealed prior to Ross coupling the subject CMV semi-trailer to the Heartland truck-tractor CMV.

As aforestated, when a shipper seals an enclosed load prior to dispatching the load/cargo with a Motor Carrier in a CMV, the shipper must provide a method, as prescribed, for the Motor Carrier to confirm the articles of cargo are secured within the sealed trailer/container. This is clarified in the Regulatory Guidance section of *FMCSR § 392.9:*

> ➢ ***Question #3***
>
> *How may the motor carrier determine safe loading when a shipper has loaded and sealed the trailer:*
>
> *Guidance: Under these circumstances, a motor carrier may fulfill its responsibilities for proper loading a number of ways. Examples are:*
>
> *a. Arrange for supervision of loading to determine compliance; or*
>
> *b. Obtain notation on the connecting line freight bill that the lading was properly loaded; or*

*c. Obtain approval to break the seal to permit inspection.*

Weldon's sworn deposition testimony confirms drivers cannot check their load for securement prior to leaving the Knauf yard, it is the Knauf loader/warehouse associate who is solely responsible for the load to be stacked correctly, and that Knauf only uses load securement straps and/or load bars upon customer request:

> ➢ (redundant) *Q: "Okay. So he comes, he's got a sealed trailer and he hooks up to that trailer and drives away. Is that generally the process?" A: "Once he picks up the paperwork, yes." Q: "Okay. So prior -- <u>but because it's sealed, he has no opportunity to inspect what's inside the trailer before he drives away, right</u>?" A: "<u>Correct.</u>" Q: "All right. Now, <u>obviously if he can't look inside the trailer, he can't know whether or not there's load straps or other safety equipment used,</u> can he?" A: "<u>Correct.</u>" Q: "So correct as in, no, he doesn't, he can't know that one way or the other?" A: "He won't know it unless he opens the doors.":* (CW: 107/1)

> ➢ *Q: "And -- let's see. So <u>it's solely the responsibility of the loader -- warehouse associate to make sure that it's stacked correctly</u>?" A: "<u>Yes.</u>":* (CW: 30/19*)*

> ➢ *Q: "And <u>is there anybody other than you that would make sure that loaders were loading product the way that Knauf wanted the product to be loaded</u>?" A: "<u>No.</u>":* (CW: 31/19)

And:

> ➢ *Q: "Does -- does Knauf use load straps on its intercompany transfers?" A: "No." Q: "Does it <u>use load straps in any context other than customers requesting it</u>?" A: "<u>No.</u>":* (CW: 141/11)

(Underlined Emphasis by Undersigned)

Whether Knauf, Heartland, and/or professional CMV driver Ross had the sole duty and/or obligation to secure the articles of cargo within the subject CMV semi-trailer is a fact left to the determination of the trier of the facts, the Jury. Ultimately, the objective is to ensure articles of cargo are adequately secured to provide both safety in transport as well as during loading and/or offloading procedures.

However, due to the loading and sealing process of Knauf and, as aforestated, Ross' inability to inspect the articles of cargo for securement; industry best practices would provide a logical obligation that the entity loading and subsequently sealing the subject CMV semi-trailer (Knauf) has a responsibility to load and secure the articles of cargo within the subject CMV semi-trailer with reasonable care. Specifically, industry best practices, standards of care, and/or logistical practicality would suggest the articles of cargo should be secured as the subject CMV semi-trailer was loaded from front to rear to allow access by the individual(s) securing the cargo.

_____

The area where the subject incident occurred is on an improved area which is adjacent to E 13th Avenue in Cordele, Georgia located to the north of the CABP facility. The surface is gravel/rock and for all intents and purposes is level. The lot area allows for a CMV to be parked and the cargo doors opened prior to the CMV reversing into the dock area of CABP. As aforestated, this parking area is located at the CABP facility; 2810 East 13th Avenue, Cordele, Georgia.

Image #3 below depicts the area of East 13th Avenue where the subject incident occurred. The approximate location that the articles of cargo fell from the CMV is marked with an orange arrow:

LEFT BLANK INTENTIONALLY



**Image #3**                                                                 **Source: Google Maps**

_____

Prior to the day of the subject incident, on February 1, 2019, Knauf's Logistics Manager, Joshua Wehr, requested a *Best Practices for Opening Trailer Doors* from Heartland's Vice President of Marketing, Kevin Loyd. Mr. Loyd received an internal response from Don McGlaughlin which he forwarded to Wehr. The response states:

➢ *Kevin,*

*The following guidelines have been promoted for trailer door opening. I hope this information will assist our friends at Knauf. Let me know if anything further is necessary.*

*Use the following as a guideline when opening doors on any trailer:*

- *NEVER open both doors at once.*
- *Check the door latch handles on the right (curbside) door. If they are tight, assume that there may be stock against the door.*
- *Check the door top for ice or other debris that could fall and injure you.*
- *Check the hinges to confirm they are in good condition.*
- *Stand directly in front of the right door, using your left hand to release the latch, while holding the door with your right hand. If there is stock against the door, the door will push you out of the way, instead of the stock falling onto you.*
- *NEVER look inside the trailer while opening the door, until you are sure there is no risk of stock falling out.*
- *Once the first door is fully opened and latched correctly, open the left (roadside) door using your right hand on the door latch handle and your left hand on the door.*

This described procedure is very similar to that which Professional CMV driver Ross described in the aforestated testimony and *Interrogatories Response* in that it describes a slow deliberate procedure which provides multiple points of safety and/or self-preservation for the person opening the rear cargo doors of a CMV semi-trailer.

―――――――――――――――――――

The Motor Carrier, Heartland is registered with the FMCSA under USDOT number 134697, with a registered name, *Heartland Express, Inc. of Iowa,* domiciled out of North Liberty, Iowa and has reported number of 1,806 power units and 1,705 drivers under authority and management.

Heartland is engaged in Interstate Commerce in the for-hire transport of; General Freight; Building Materials; Commodities in Dry Bulk; Refrigerated Food; Beverages; and Paper Products according to their FMCSA filing. As Heartland is authorized as an Interstate For-Hire Motor Carrier, they can provide transportation of property or as referred herein as articles of cargo.

The Safety and Fitness Electronic Records (SAFER) System is provided by FMCSA and allows users to access safety related information of Motor Carriers. The Safety Measurement System (SMS) allows for access to a rolling 24-month history of a Motor Carrier's safety information including information from both roadside inspections and FMCSA investigations in the same 24-month period.

15

These records are helpful to Motor Carriers, Freight Brokers, Enforcement Personnel, and the Public in terms of the Motor Carrier's safety performance regarding both professional CMV drivers and the equipment on the motor vehicles being operated by the Motor Carrier.

Examination of the SMS BASICs report on Heartland, dated February 13, 2024, lists a driver OOS rate of 0.6% compared to the national average of 6.00% as well as a vehicle OOS rate of 14.5% which is below the national average of 21.4%. The report also demonstrates a baseline measures (score) in the critical safety area of *Driver Fitness* which reflects a score of .01 which is the result of 2,280 NASI containing only 3 violations relating to *Driver Fitness*. When a Motor Carrier has low scores in critical safety areas such as *Driver Fitness* it is often an indicator that the Motor Carrier has been proactive with their professional CMV drivers through instruction and/or employee management which results in a higher probability of reduced pernicious crashes and/or incidents.

Being an Interstate Motor Carrier such as Heartland, the Motor Carrier is compelled to comply with the FMCSR thus making Heartland responsible for the hiring, training, and management of their professional CMV drivers in accordance with those motor carriage governing regulations and best practices.

It is not enough to merely instruct but the Motor Carrier employer must continue instructions and ensure the professional CMV driver is applying said instruction through his/her daily performance of the *Safety-Sensitive Function*.

Furthermore, there are many areas or situations that my provide opportunity for a professional CMV driver to become injured and possibly killed, and that specific scenario is not addressed in the FMCSR; however, that is where and when best practices come into play. A Motor Carrier must train their professional CMV drivers in best practices to prevent injury and/or death. In addition, the Motor Carrier must document such best practice and/or industry standards of care training such as the aforestated *Best Practices for Opening Trailer Doors.*

Heartland's safety record demonstrates their commitment to operating within the FMCSR and demonstrating industry standards of care. FMCSA's SAFER reflects the commitment of Heartland through their safety scores. The scores in SAFER are the result of NASI performed by qualified inspectors and quantify a Motor Carrier's efforts and commitment to professional and safe operations.

---

The FMCSRs do not directly address the actions of a professional CMV driver during loading and/or unloading procedures but places responsibility on the Motor Carrier employer and their professional CMV driver employee to be trained in and capable of performing all S*afety-Sensitive Functions* in the course of their work responsibilities.

Readiness to work from the time he/she begins work until such time he/she is relieved from work and all responsibility; including on private property and/or fixed facilities is required, not just

driving. The professional CMV driver must be so instructed and knowledgeable in the best practices and necessary safety precautions that must be implemented.

Specifically, there is a responsibility for Heartland to train professional CMV driver Ross in all aspects of CMV semi-trailer operations including best practices. The responsibility to instruct does not end with the physical duties of the professional CMV driver, it continues onto the duty of the professional CMV driver to follow internal company policies as well as verbal instructions from employees of the shipper/warehouse.

Professional CMV driver Ross' mere possession of a valid CDL-A issued by the State of Arkansas indicates that Ross has a higher degree of skill level/knowledge than CMV drivers who possess the basic CDL or CDL-B.

By way of obtaining a CDL-A, Ross had to have demonstrated the necessary skills to operate the subject CMV in order to achieve a CDL-A. In addition, Ross was presented with a scenario wherein any reasonable CMV operator could have been involved in a similar incident. It is self-evident Ross was vested in performing his *Safety-Sensitive Functions* in a safe and professional manner, due to the diligence and care shown in his professional work practices; specifically, utilizing industry standards and/or best practices in regard to opening the rear cargo doors on his CMV semi-trailer.

## 6.0 Specific Rebuttal of Expert John Pinckney Report-

Counsel for the Plaintiff, Knauf, has provided a *Report of Opinion* through discovery which has been prepared by Pinckney. Pinckney provides several conclusionary opinions regarding the causations of the subject incident wherein Knauf failed to adequately secure cargo within the Heartland CMV and in the subsequent incident professional CMV driver Ross was injured which is the basis for this litigation. Applying the knowledge, experience, and education of the undersigned, along with standards of care and the FMCSR those opinions will be analyzed as follows:

> ➢ **Opinion #1 – Mr. Ross Failed to Follow the Heartland Express Guideline to Opening Trailer Doors**
>
> Pinckney opines that Ross's description of opening the CMV semi-trailer doors does not follow Heartland's guideline for opening CMV semi-trailer doors wherein Ross states he is parallel to the semi-trailer door when opening it and therefore Pinckney opines Ross would not be behind the CMV semi-trailer door.
>
> Heartland had shared their CMV semi-trailer door opening guideline with Knauf (February 1, 2019) approximately two years prior to the subject incident:

➢ *Use the following as a guideline when opening doors on any trailer:*

- *NEVER open both doors at once.*

17

- *Check the door latch handles on the right (curbside) door. If they are tight, assume that there may be stock against the door.*

- *Check the door top for ice or other debris that could fall and injure you.*

- *Check the hinges to confirm they are in good condition.*

- *Stand directly in front of the right door, using your left hand to release the latch, while holding the door with your right hand. If there is stock against the door, the door will push you out of the way, instead of the stock falling onto you.*

- *NEVER look inside the trailer while opening the door, until you are sure there is no risk of stock falling out.*

- *Once the first door is fully opened and latched correctly, open the left (roadside) door using your right hand on the door latch handle and your left hand on the door.*

*Bates - KNAUF000019*

In his *Answers to Interrogatories*, Ross describes his normal procedure he uses for opening the CMV semi-trailer doors wherein he describes a process extremely similar to Heartland's guidelines:

➢ *"I have been opening trailer doors like the ones I opened in this case on and off for 40 years, and I have been a tractor trailer driver for twenty years. In my experience, the "best practice" can be contextual to the circumstances presented. In general, when you are opening a trailer like the one I opened in this case (meaning it has a left and right doors) two doors (left and right) and you are opening the doors from the ground (as opposed to the trailer being level with a loading dock), you start by opening the right door because the right door overlaps the left door. Before opening the right door, you check for signs that cargo is pressing against the door, or for other potential problems. If there are no problems, you position your body in such a way that you can open the right door without any falling cargo hitting you. You then carefully open the door, and again make sure as best you can tell that the cargo will not fall. You then walk the door around to the side of the trailer. You then secure it to the side so that it does not swing freely. After opening the right doors, position your body on the right side (if you are not already there), and you visually inspect the left side (the cargo door on the left) for any problems. After confirming, as best you can, that the cargo will not fall you open the left door by keeping your body on the right, reaching for the left latch with your left hand and carefully open the left side door. You then walk the left door around and secure it to the side."*: (Ross' response to Interrogatory #1)

Ross's *Answers to Interrogatories* (Answer #3) as well as his deposition testimony indicates he was following the guidelines above when a breeze caught the driver's side door as it was

swinging out and as Ross attempted to control the door it swung him back towards the CMV semi-trailer at which time the unsecured bundles of insulation fell from the CMV semi-trailer onto Ross.

In his testimony of February 28, 2024, Ross does use the term parallel to describe his location in relation to the CMV semi-trailer door. However, it is the opinion of the undersigned that without a visual reference as to Ross's meaning of parallel it would be non-sensical to assume he was not behind the CMV semi-trailer door as is Pinckney's opinion: *Q: "Okay. When you say that you're walking the door around to latch it, where are you in relation to the door at that time?" A: "*<u>*Parallel with it*</u>*. I mean, you -- you open the door, swing it around so you got the handle in your hand (indicating). And as the door comes open -- you know, this isn't a 360 handle, so you've got ahold of the handle walking around with the door because you -- you either push it or pull it. And I would have it with this hand walking around with the door." Q: "So in what you're describing, you're pushing the door around?" A: "Yes."*: (JR: 205/5: 02/28/2024).

Additionally, Ross stated within his *Answers to Interrogatories* that, while not flush, the articles of cargo did not appear to pose a risk of falling from the CMV semi-trailer. The following are excerpts from his response to Question #3 (redundant):

> *I stood behind the left door because there is a latch/lock that prevents the left door from opening/moving when you open the right door, and if anything fell I would be shielded from the falling cargo and from the right door swinging out. <u>The stacked cargo was not completely flush, but it otherwise appeared stable</u>. I continued opening the right door by walking around to the side of the trailer. I then secured the right door by walking it around to the side of the trailer. I then secured the right door to the side of the trailer so it would not swing. After securing the right-side door, I again determined that it was safe to stand in front of the cargo on the right side so I could inspect the cargo on the left. While standing to the right, I looked at the cargo on the left/the left door to make sure it was safe to open the left door. <u>The stacked cargo on the left was not perfectly flush, but it appeared similar to the cargo on the right. It did not appear to be a fall risk based on what I saw. It was not leaning against the left side door. It was not moving. I did not see any indication that it was a fall hazard.</u> I believed it was safe to open the left side door.* (Ross response to Interrogatory #3)

<small>(Underlined Emphasis by Undersigned)</small>

It is clear from Ross's statements that there was no obvious shift to the articles of cargo upon opening the doors of the CMV semi-trailer and no portion of the articles of cargo within his CV semi-trailer were obviously falling from the trailer.

It should be noted that Heartland's guideline as listed above is just that. It is not a policy of Heartland nor is this action regulatory in terms of the FMCSR. Additionally, it is most probable that Ross's method of opening the CMV semi-trailer doors on the Heartland CMV was not causative to the subject incident.

Had Knauf performed the basic and rudimentary procedure of adequately securing the articles of cargo within the CMV semi-trailer the subject incident would not have occurred, regardless of the procedure followed when opening the CMV semi-trailer doors.

This response is also relevant for Opinion #3 of Pinckney wherein he indicates Ross would have observed the lack of securement when looking behind the closed CMV semi-trailer doors to confirm the articles of cargo had not shifted.

o    **Opinion #2 – Customer Service**

In this conclusion, Pinckney opines that Knauf satisfied the industry standard for customer service because there was no request from the customer to secure the articles of cargo. McGrew, Bjerke, and Todd all comment on previous incidents of Knauf cargo falling from CMV semi-trailers and that they had requested adequate securement of articles of cargo be provided by Knauf:

➤ **McGrew:**

> Q: *"Okay. Did Cameron Ashley ask Knauf before this date to use load bars or blocking or some sort of securement device on shipments from their plants?" A: "I know I requested from my purchasing manager, Ethan Mungai, and then my RVP and our safety coordinator -- but I don't remember who that was -- that they reach out to Knauf on this because this is -- Excuse me. Sorry about that. -- this is one of those manufacturers that we didn't have day-to-day contact because it was handled mostly at corporate. So we had requested that corporate reach out to them and request that."*: (BM/ 17/18).

> Q: *"Okay. I believe you said that there were three -- or you mentioned three incidents of falling freight that you were aware of. Were those all -- were you saying that those were all Knauf loads, the three –" A: "Yes, sir." Q: "Okay. Do you recall when those were?" A: "No, sir, not the exact dates. I could just tell you the range if you would like. Q: "Okay. Yeah. Range is good." A: "One would be late 2020, one would be early 2021, and then probably spring of 2021." Q: "Okay. Do you recall anything about those loads, anything in particular?" A: "Just that there weren't any safety equipment used to prevent them from falling over."*: (BM: 29/20).

> Q: *"So you had conversations with Ethan Mungai and John Gambone about reaching out to Knauf about the load securement issues, but they never told you specifically that they did?" A: "They said they did."*: (BM: 33/23).

➤ **Todd:**

> Q: *"Now, in your experience had any other trailer loads from Knauf fallen like that before?" A: "Yes." Q: "Okay. So before June of 2021 there had been other instances of trailers from Knauf falling when y'all went to unload them?" A:*

*"Yes, sir." Q: "Can you tell us about those, please?" A: "There was multiple times that we had had loads that came in that when they would back up to the doors they would open up and, of course, the insulation -- at least the first two to three stacks of insulation would fall out. So <u>we had multiple times that that was happening</u>. That's the whole reason we had been trying to discuss it with Knauf as far as getting them to start strapping their loads like they were supposed to."*: (ET: 23/19)..

*Q: "I believe that -- I just want to clarify -- so as you sit here today, do you know if anyone at Cameron Ashley talked to anyone at Knauf about securing loads prior to the incident?" A: "I had heard that there were emails sent out about securing the loads, but I don't -- me personally, I wouldn't have had access to their emails." Q: "Okay. So who told you that?" A: "Will Toler had told -- we had talked about it on multiple times." Q: "So Will Toler told you that there had been emails exchanged between people at Cameron Ashley and people at Knauf?" A: "Yes, sir."*: (ET: 44/10)

*Q: "Did Will Toler tell you anything about what he was asking Knauf to do to secure loads?" A: "I know that he wanted at least two load straps on the loads at all times." Q: "Anything else that you can recall?" A: "And they had -- as far as I know, he had discussed with them about the shrink-wrapping the last two layers -- or last two stacks."*: (ET: 46/21).

➢ **Bjerke:**

*Q: "Okay. And -- and, you know, we're here today because insulation fell off the back of one of the trucks that was being delivered to the Cordele facility. <u>Prior to June of 2021, had Cameron Ashley had any issues with product falling off the back of trucks that had been loaded at Knauf</u>?" A: "Maybe a couple. <u>Yes.</u>"*: (MJB: 15/18).

*Q: "And the line, "We have asked for some fix to this as it has happened multiple times." Who's the person that asked for a fix to this falling freight issue before?" A: "That would have been myself and Ethan." Q: "Okay. And you -- you mentioned that had fall <u>-- how many times did you have this discussion with someone at Knauf about falling freight</u>?" A: "I don't recall the exact number." Q: "Based here, it was leased more than once, right?" A: "Yeah. <u>It was probably three, four.</u>"*: (MJB: 23/14)

As aforestated, Knauf took a lackadaisical approach to responding to customer service comments regarding load securement, obviously an operandi of profit over safety. In his sworn deposition testimony Weldon states that unless the customer service response specifically requests Knauf use cargo securement devices Weldon considers the customer comments as unjustified (redundant): *Q: "Okay. So something like this comes to the -- so do you receive this specific description?" A: "Yes." Q: "How do you interact with this?" A: "The process in which I do any*

21

*service claim is I'll pull the pick list, and at the end of the day, <u>if the customer did not request on the pick sheet, load securement, then I unjustify it</u> and send it back to corporate."*: (CW: 258/17).

It is of interest to note that, as directed by Heartland, professional CMV driver Ross arrived at Knauf with load securement straps and offered them to a Knauf employee to utilize when loading the subject CMV semi-trailer with insulation. Subsequently, the Knauf employee advised Ross that Knauf had load securement straps and he did not need Ross' load securement straps (redundant): *Q: "Who did you talk to at Knauf when you got there?" A: "I don't know the gentleman's name. He was a black gentleman. I went up. There was another driver ahead of me so he took care of him, and then I told him who I was and what I was there for. And I had two load straps with me because the -- the dispatch required -- required me to supply two load straps. <u>And I had the two load straps with me, and -- and I presented them to him,</u> and <u>he told me that they already had some, that he didn't need them,</u> and that the trailer wasn't quite ready yet, to go back out and wait in my truck. And I left my phone number with him, and he said he would call me when it was ready. So I went back out to the truck and I waited, I believe it was about an hour and a half. And he called me and told me that the trailer was loaded and ready to come pick up the paperwork."*: (JR: 224/23; 02/28/2024).

It would be a sensical conclusion on the part of Knauf that the offering of load securement devices by a Motor Carrier and their professional CMV driver would be viewed as a request to apply load securement devices to the articles of cargo within the CMV semi-trailer prior to sealing the CMV semi-trailer. Knauf's failure to utilize the load securement devices offered by Ross is a proximate cause to the subject incident.

As aforestated, it is most probable that this statement and/or actions by the Knauf employee reinforced Ross' reasonable expectation that the articles of cargo were adequately secured by Knauf prior to Knauf employees sealing the CMV semi-trailer which Ross coupled to his CMV truck-tractor.

It is the opinion of the undersigned that the industry standard for customer service would be a safe work environment free from falling articles of cargo which were not adequately secured within the CMV.

o    **Opinion #4 – Load Securement is not a Guarantee Against Falling Cargo:**

While the undersigned agrees that there are no absolutes when it comes to securing articles of cargo, there is unsurmountable evidence that the proper application of load securement devices extremely minimizes the risks of articles of cargo shifting and/or falling from the CMV. The risk comparison between no load securement and adequate load securement easily shows the higher risk of a pernicious incident such as the subject incident when there is no load securement in place on the CMV.

It is most probable that, had Knauf performed the basic rudimentary duty of wrapping the bundles of insulation and placing adequate load securement devices at the rear of the CMV semi-

trailer the subject incident would not have occurred. This failure to take due care and caution by Knauf was the overarching proximate cause to the subject incident.

o       **Opinion #5 – Pinckney Fails to Recognize Knauf's Responsibilities**

In his final opinion, Pinckney states that Knauf was not subject to the FMCSR and therefore it was solely the responsibility of Heartland and Ross to comply with the regulations. Pinkney opines that Heartland and Ross are subject to *FMCSR § 392.9(a)* but fails to acknowledge the sealed trailer exception for the CMV driver and Motor Carrier under *FMCSR § 392.9(b)(4) (redundant)*:

> ➢ *FMCSR § 392.9 Inspection of cargo, cargo securement devices and systems.*
>
> *(b) Drivers of trucks and truck tractors. Except as provided in paragraph (b)(4) of this section, the driver of a truck or truck tractor must—*
>
>> *(4) The rules in this paragraph (b) <u>do not apply to the driver of a sealed commercial motor vehicle who has been ordered not to open it to inspect its cargo</u> or to the driver of a commercial motor vehicle that has been loaded in a manner that makes inspection of its cargo impracticable.;*

or the guidance provided in the *Regulatory Guidance; Question #3 for FMCSR § 392.9* as detailed below

 Motor Carriage industry best practices and/or standards of care, as well as the specific loading circumstances in this case, specifically sealing the CMV semi-trailer, the refusal of the cargo straps offered by professional CMV driver Ross, and directing Ross to wait in his truck-tractor during the loading of the CMV semi-trailer, indicate, with a high degree of probability, that the shipper intends to bear the burden and/or responsibility of adequate securement of articles of cargo within the subject CMV semi-trailer.

In some cases, such as when the CMV semi-trailer is sealed, shippers' actions are specifically mentioned in the FMCSR and their interpretations. Specifically, while the Motor Carrier and professional CMV driver are subject to the FMCSR, the shipper shares the burden of adequate load securement in a sealed CMV.

This is clarified in the Regulatory Guidance section of *FMCSR § 392.9 (redundant)*:

> ➢ *Question #3*
>
> *How may the motor carrier determine safe loading <u>when a shipper has loaded and sealed the trailer</u>:*
>
> *Guidance: Under these circumstances, a motor carrier may fulfill its responsibilities for proper loading a number of ways. Examples are:*

23

*a. Arrange for supervision of loading to determine compliance; or*

*b. Obtain notation on the connecting line freight bill that the lading was properly loaded; or*

*c. Obtain approval to break the seal to permit inspection.*

Evidence and testimony documents reviewed by the undersigned show a high probability that Knauf was aware of the importance of adequate securement of articles of cargo they failed to take basic and rudimentary actions to which, in all probability, would have prevented the subject incident; a clear profit over safety modus operandi on the part of Knauf.

## 7.0 Opinions-

Based upon the foregoing analysis, as a Commercial Motor Vehicle expert possessing in excess of 30 years-experience in the Transportation Industry and based upon what is good and safe practices in the Transportation Industry, I have come to form the following opinions as to the incident that caused the injuries to Plaintiff Ross which occurred at or near 2810 East 13th Avenue, Cordele, Crisp County, Georgia.

I express these opinions to a reasonable degree of professional certainty and probability:

1. It is the undersigned's opinion that professional CMV driver Ross contributed in no manner whatsoever as to the cascading of the articles of cargo from his CMV semi-trailer for the following reasons:
   a. Ross attempted to provide cargo securement straps to Knauf wherein Ross was advised Knauf already had cargo securement straps and they didn't need those which Ross had offered.
   b. Ross was directed by a Knauf employee to wait in his truck-tractor thereby removing Ross' ability to observe the loading of his CMV semi-trailer and inspect the securement of the articles of cargo prior to the CMV semi-trailer being sealed by a Knauf employee.
   c. Ross observed the CMV semi-trailer was sealed and, as he understood he could not break that seal until authorized by the receiver of the load, he relied on the reasonable and/or sensical expectation that Knauf had adequately secured the articles of cargo within the CMV semi-trailer.
   d. Ross, to the best of his abilities, followed Heartland's guide to opening CMV semi-trailer doors on the day and time of the subject incident.

2. It is the undersigned's opinion that had Knauf performed the basic and rudimentary, yet vitally important, safety function of applying adequate means of securement, the cargo straps Ross offered to the Knauf employee at a minimum, for the articles of cargo loaded upon Ross's Heartland CMV semi-trailer ensuring the articles of cargo within Ross'

CMV were secure from shifting and/or falling from the CMV semi-trailer the subject incident would not have occurred.

3. It is the undersigned's opinion that a very real and predictable outcome is foreseeable when transporting articles of cargo which were not adequately secured. Whereas Knauf's failure to adequately secure the articles of cargo presented a clear risk of injury and/or death to persons performing offloading procedures, as in the incident forming the basis for this litigation, the significance of Ross's responsibility is unequivocal.

4. It is the undersigned's opinion that professional CMV driver Ross acted reasonably while operating the Heartland CMV, committing to and/or executing the rear cargo door opening procedure in a best practices manner with the intent of self-preservation and overall safety.

5. It is the undersigned's opinion that if not for the failure of Knauf to employ industry standards of care and/or heeding the *Regulatory Guidance* within *FMCSR § 392.9* by adequately securing the articles of cargo prior to sealing and releasing the CMV semi-trailer to the Motor Carrier Heartland and therefore professional CMV driver Ross, the subject incident would not have occurred.

6. It is the undersigned's opinion that Knauf demonstrated a careless disregard and/or failure of due diligence when they never properly investigated the multiple complaints filed regarding cargo shifting within and/or falling from CMVs; thereby demonstrating a careless disregard for future CMV drivers and/or dockworkers operating around CMVs loaded by Knauf. A clear profit over safety modus operandi.

7. It is the undersigned's opinion that, regardless of the scenario of which professional CMV driver Ross' injuries factually derived from, had Knauf complied with industry best practices, by adequately securing the articles of cargo within the Heartland CMV semi-trailer, the subject incident would not have occurred.

8. It is the undersigned's opinion that Knauf failed to recognize the request to apply the load securement devices (load straps), offered by Ross prior to the CMV semi-trailer being loaded by Knauf, resulting in the articles of cargo falling from the Heartland CMV resulting in injury to Ross. This failure by Knauf was a proximate cause to the subject incident.

25

9. It is the undersigned's opinion that Knauf demonstrated a careless indifference in terms of the safety not being afforded to loading dock employees and/or CMV drivers, namely the injured party, Ross.

10. It is the undersigned's opinion that professional CMV driver Ross possessed the required State of Arkansas CDL license to operate the subject CMV.

11. It is the undersigned's opinion that professional CMV driver Ross was qualified in terms of his CDL-A to operate the CMV that he was assigned by his Motor Carrier employer, Heartland.

12. It is the undersigned's opinion that, to a high degree of probability, CABP contributed no actions and/or inactions in terms of the causation of the subject incident.

13. It is the undersigned's opinion that professional CMV driver Ross had every right to be operating the CMV he was assigned in the area of which the subject incident occurred, there were no restrictions and/or prohibitions.

14. It is the undersigned's opinion that Ross had the right of reasonable expectation that the articles of cargo preloaded into the subject CMV semi-trailer were adequately secured by Knauf prior to Ross coupling the CMV semi-trailer to his CMV truck-tractor.

15. It is the undersigned's opinion that the shipper, Knauf, relied upon assumptions. Assumptions are not a substitute for good policies and/or standards of care. Assumptions cause incidents; Assumptions regarding articles of cargo being adequately secured within Ross' CMV by Knauf led to the subject incident causing injury to Ross.

16. It is the undersigned's opinion that professional CMV driver Ross had a reasonable expectation that the articles of cargo within a sealed CMV semi-trailer would be adequately secured by the loading authority, in this case Knauf, and that the articles of cargo would remain unitized and/or not fall from the CMV semi-trailer, therefore allowing him to safely open the rear cargo doors on his CMV upon arriving at his destination. This reasonable expectation was enhanced when a Knauf employee refused to use cargo securement devices offered by Ross, advising Ross that Knauf had their own cargo securement devices.

17. It is the undersigned's opinion that the Motor Carrier, Heartland., emphasizes safe and professional operations as their performance record within the SAFER system indicates they have a Driver OOS rating of 0.6% while the system lists a national average of 6.0%.

18. It is the undersigned's opinion that the Motor Carrier, Heartland, emphasizes safe and professional operations as their performance record within the SAFER system indicates they have a Vehicle OOS rating of 14.5% while the system lists a national average of 21.4%.

19. It is the undersigned's opinion that the incident while being an unfortunate event, the Motor Carrier, Heartland, and therefore professional CMV driver Ross, demonstrated as to being a Motor Carrier and a CMV driver that complied to the best of their ability in terms of the FMCSR.

20. It is the undersigned's opinion that the overarching causative factor to the subject incident is that Knauf failed in their shared burden and/or responsibility to cause, the articles of cargo loaded on Ross' CMV to be adequately secured within industry standards of care and/or best practices.

**Note:** The aforelisted opinions are in addition to the main body of the preceding report, of which are likewise to be considered additional to the undersigned's opinions.

**Documents Reviewed:**

There are various documents examined as listed below in "Documents Reviewed" section of this report. Throughout the review process, the specific points, testimony, and issues of the examination are included in this report while they are often applied to industry standards of care and the FMCSR, in combination with the undersigned's years of experience, training, and knowledge.

- Deposition Transcription of John Ross; Mississippi Workers' Compensation Committee
- Deposition Transcript of John Ross; w/exhibits; February 28, 2024
- Deposition transcript of Cody Welden; w/exhibits
- Deposition Transcript of Eric Todd; w/exhibits
- Deposition Transcript of Brian McGrew; w/exhibits
- Deposition Transcript of Mark John Bjerke; w/exhibits
- Complaint
- Plaintiff's Consolidated Discovery Request to Defendant
- Plaintiff's Answers to Interrogatories Propounded by the Defendants
- Defendant Knauf Insulation, Inc's Objections and Responses to Plaintiff's Consolidated Discovery Requests
- Defendant Knauf Insulation, Inc's Supplemental Responses to Plaintiff's Consolidated Discovery Requests
- Heartland Express's Responses to Interrogatories and Requests for Production Propounded by John Ross
- Motor Carrier Shipper Agreement; Knauf Insulation, Inc and Heartland Express, Inc.
- Knauf Insulation, Inc. Bill of Lading
- Knauf Insulation, Inc. Training Checklists (9)
- Email Chain Between David Crosby (Knauf) and Judy Groenwald (Heartland); June 11 and June 14, 2021
- Internal Emails of Cameron Ashley Building Products (9)
- Internal Email Chain of Knauf Insulation, Inc.; June to August 2021
- Expert Report of Jeffrey T. Windham, CPA, ABV, CFF, CVA; w/Appendixes

- ➢ Expert Report of Dr. Carol Walker, PhD, ABPP, CLCP; Neuro Life, LLC
- ➢ Expert Report of John Pinckney; National Transportation Consultants, Inc.; with Supporting Documents
- ➢ Photographs From Scene of Incident (9)

**References:**

- Federal Motor Carrier Safety Regulations: § 390.3; § 390.5; § 391.15; § 392.9; § 383; § 383.5; § 391: § 391.11; § 383.111
- Weather Underground History - https://www.wunderground.com/history

**As the signer of this report, I reserve the right to change or amend my conclusions and opinions based on information that was not available to me at the time of this report writing. Should the need for such changes or amendments be necessary I will submit the same to the retaining counsel of this report.**

**Reported By:**

**Scott L. Turner,
Chief Consultant**