# Exhibit 3

# Scott Turner Deposition

# Video Deposition of Scott Turner

## July 25, 2024

## Ross v. Knauf Insulation, Inc., et al.

## 3:23-CV-00284-RAH-SMD



866.993.0207
info@citedepos.com
www.citedepos.com

Page 1

1    IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3          EASTERN DIVISION

4

5    JOHN ROSS,

6      Plaintiff,

7      vs.        CASE NO: 3:23-CV-00284-RAH-SMD

8    KNAUF INSULATION, INC.,
9    et al.,

10     Defendants.

11      * * * * * * * * * * * * *

12

13    REMOTE VIDEOTAPED DEPOSITION OF

14        SCOTT L. TURNER

15

16      July 25, 2024

17      1:19 p.m. CST

18

19

20      Location:

      Cite's Virtual Meeting Room

21

22

23    Tracye Sadler Blackwell, ACCR No. 294

---

Page 2

1    APPEARANCES OF COUNSEL (via Zoom)

2

3    ON BEHALF OF THE PLAINTIFF:

4    Ms. Victoria Dye, Esq.
     MORGAN & MORGAN BIRMINGHAM, PLLC
5    216 Summit Boulevard
     Suite 300
6    Birmingham, Alabama  35243

7

     ON BEHALF OF THE DEFENDANT KNAUF INSULATION, INC.:
8
     Mr. Patrick L.W. Sefton, Esq.
9    CAPELL & HOWARD, P.C.
     Attorneys at Law
10   150 South Perry Street
     Montgomery, Alabama  36104
11
     Ms. Christina Baugh, Esq.
12   BARNES & THORNBURG, LLP
     3340 Peachtree Road NE
13   Suite 2900
     Atlanta, Georgia  30326-1092
14

15   ON BEHALF OF THE INTERVENOR:

16   Mr. Christopher Graves, Esq.
     MARKOW WALKER, P.A.
17   265 North Lamar Boulevard
     Suite I
18   Oxford, Mississippi  38655

19

     ALSO PRESENT:
20
     Mr. Wes Sparkman, Videographer

21

22

23

---

Page 3

1          EXAMINATION INDEX

2

3    SCOTT L. TURNER

4      BY MS. BAUGH              7
       BY MS. DYE              147

5

6

7          DEFENDANT'S EXHIBIT

8    EX 1  June 3, 2024 Report        8

9

10

11      PLAINTIFF'S EXHIBITS

12   EX 1  Heartland's Responses to Knauf's    148
13      First Interrogatories

14   EX 2  Heartland Express' Responses to    152
        Interrogatories and Requests for
15      Production Propounded by John Ross

16   EX 3  List of Complaints              155

17

18

19

20

21

22

23

---

Page 4

1          STIPULATIONS

2      It is hereby stipulated between counsel

3    representing the parties that the deposition of

4    SCOTT L. TURNER is taken pursuant to the Federal

5    Rules of Civil Procedure and that deposition may be

6    taken before Tracye S. Blackwell, CCR, RPR, without

7    the formality of a commission, that objections to

8    questions other than objections as to the form of

9    the question need not be made at this time but may

10   be reserved for a ruling at such time as the said

11   deposition may be offered in evidence or used for

12   any other purpose by either party provided for by

13   the Statute.

14      It is further stipulated between counsel

15   representing the parties in this case that the

16   filing of said deposition is waived and may be

17   introduced at the trial of this case or used in any

18   other manner by either party hereto provided for by

19   the Statute regardless of the waiving of the filing

20   of the same.

21      It is further stipulated between the parties

22   hereto and the witness that the signature of the

23   witness to this deposition is hereby waived.

Video Deposition of Scott Turner

Page 5

1    THE VIDEOGRAPHER:  We are on the
2       record.  Today is Thursday,
3       July 25th, 2024, at
4       approximately 1:19 p.m.
5       Central Standard Time.
6          My name is Wesley
7       Sparkman, and the court
8       reporter is Tracye Blackwell.
9       We're here on behalf of Cite
10      Court Reporting of Montgomery,
11      Alabama.
12          This is the video
13      deposition of Scott L. Turner,
14      which was noticed by Patrick
15      Sefton for case Ross v. Knauf
16      Insulation, Inc., et al., in
17      the United States District
18      Court, Middle District of
19      Alabama, Eastern Division,
20      Case Number
21      3:23-CV-00284-RAH-SMD.
22          Counsel, please identify
23      yourselves for the record,

Page 6

1       starting with the plaintiff.
2    MS. DYE:  Victoria Dye for the
3       Plaintiff.
4    MS. BAUGH:  Christina Baugh for
5       Defendant Knauf Insulation.
6    MR. GRAVES:  Christopher Graves
7       for the Intervenors Heartland
8       Express, Inc.
9    MR. SEFTON:  Pat Sefton for Knauf
10      Insulation.
11   THE VIDEOGRAPHER:  Will the court
12      reporter please administer the
13      oath to the witness.
14
15   (Witness affirms.)
16
17   THE COURT REPORTER:  Usual
18      stipulations?
19   (Counsel agree.)
20
21
22
23

Page 7

1          SCOTT L. TURNER
2    The witness, after having first affirmed to
3    speak the truth, the whole truth and nothing but
4    the truth, testified as follows:
5             EXAMINATION
6    BY MS. BAUGH:
7    Q.  Good afternoon, Mr. Turner.
8    **A.  Good afternoon.**
9    Q.  I see that you have some papers there in
10      front of you.  What do you have in print in
11      front of you?
12   **A.  Sure.  A copy of my report.**
13   Q.  Okay.  And that would be -- I'm sorry?
14   **A.  The report you-all have.**
15   Q.  Okay.  So the one dated June 3rd, 2024.  Is
16      that correct?
17   **A.  That's correct.**
18   Q.  All right.  And I'm actually going to mark
19      that as Defense Exhibit 1 for this
20      deposition.
21          (Defendant's Exhibit 1 was marked
22          for identification.)
23   Q.  I'm going to put it up on the screen, and

Page 8

1    we can also -- I'm glad that you do have it
2       there to follow along because there may be
3       times when you want to jump to a different
4       section as well.
5    **A.  Sure.**
6    Q.  So for the purposes of marking the exhibit,
7       this is Defense Exhibit 1.  Does this
8       appear so far to be correct, Mr. Turner, as
9       your report dated June 3rd?
10   **A.  Yes, ma'am.**
11   Q.  All right.  And your report on that date is
12      28 pages long; correct?
13   **A.  Let me just confirm that.  I believe it**
14   **was, yes, but let me just confirm that real**
15   **quick.**
16          **28.  And actually -- yeah, 28 plus my**
17   **CV as well.**
18   Q.  Yes.  I apologize.  The substantive portion
19      of your report that contains your opinions
20      is the 28-page aspect.  Is that correct?
21   **A.  That's correct.**
22   Q.  All right.  And shown on the screen on
23      page 28, that is your signature there.  Is

Video Deposition of Scott Turner

Page 9

1  that correct?

2  **A. Affirmative.**

3  Q. Okay. Thank you.

4    Also here on page 28, Mr. Turner, I see

5  under references you have some sections out

6  of the Federal Motor Carrier Safety

7  Regulations Act. Is that accurate?

8  **A. That's correct.**

9  Q. Okay. Did you rely on any other of the

10  regulations out of the Federal Motor

11  Carrier Safety Regulations other than those

12  that are cited here?

13  **A. Well, predominantly 392.9, but we look at**

14  **all of the regulations in concern --**

15  **concerning a commercial motor vehicle crash**

16  **or incident or whatever it may be. And it**

17  **doesn't mean necessarily we're going to**

18  **incorporate them into a report, but I can**

19  **tell you that 392.9 certainly was a seminal**

20  **regulation in the report.**

21  Q. Okay. But there are other regulations

22  listed. You've got, for instance, 390.3,

23  390.5. But overall the ones that you've

Page 10

1  relied upon for the rendering of your

2  opinions in this case, those are the ones

3  that you have listed on page 28 of your

4  report?

5  **A. Sure. But, you know, let me just put it**

6  **this way. So, for example, you have 390.5.**

7  **You want to get the definition of employee**

8  **and employer, commercial motor vehicle in**

9  **terms of non-CDL. You would find those**

10  **under definitions in there.**

11    **So there's a -- 383 is -- 383.111, for**

12  **example, is listed there too. That's the**

13  **20 points of required knowledge of a**

14  **commercial motor vehicle driver.**

15    **So, you know, again, we add them -- we**

16  **add these into there. It doesn't**

17  **necessarily mean that we utilize them in**

18  **the body of the report, but it's something**

19  **that we always consider. And we like to**

20  **make sure we list it there for your**

21  **purposes.**

22  Q. Okay. Were there any of the Federal Motor

23  Carrier Safety Regulations that you needed

Page 11

1  to -- or that you did utilize for your

2  opinion that are not listed here on

3  page 28?

4  **A. One more time, please. I'm sorry.**

5  Q. Absolutely.

6    Were there any Federal Motor Carrier

7  Safety Regulation sections that you relied

8  on in rendering your opinion in this case

9  that are not listed on page 28?

10  **A. Well, if it's not in the report -- if it's**

11  **not in the body of the report, then we**

12  **would not have. But anything that -- any**

13  **regulations under FMCSR that we did rely**

14  **upon is published in the report.**

15    **But as you see, some of these in**

16  **here -- like 391.15, you know, that's**

17  **getting into a driver being, you know,**

18  **prohibited. So, you know, it's not**

19  **necessarily going to be something that we**

20  **listed or not, but what I'm just saying is**

21  **that any regulation that we use is in the**

22  **body of the report predominantly and 392.9**

23  **most importantly.**

Page 12

1  Q. All right. Did you rely upon any other

2  standards in rendering your opinion?

3  **A. No. Just get a confirmation of weather and**

4  **that's about it.**

5  Q. Okay. Did you rely upon any other

6  authoritative sources for rendering your

7  opinion?

8  **A. Not insofar as I recall.**

9  Q. Okay. Did you speak with Mr. Ross prior to

10  preparing your report?

11  **A. No, ma'am. Only read his deposition.**

12  Q. Did you watch his deposition video?

13  **A. No, ma'am. I typically refrain from doing**

14  **that. I prefer just to read the deposition**

15  **because it all comes out equal at that**

16  **point. People's words are important to me.**

17  Q. Okay. So what I'd like to do,

18  Mr. Turner -- and as I said, I'll put them

19  on the screen just for the sake of making

20  sure we're looking at the same thing. But,

21  obviously, please look at any part of your

22  report that you think is necessary to

23  answer our questions as we go through this.

Page 13

1  Just let me know where it is that you're
2  looking if you're citing something or
3  referencing something different than what I
4  am referencing.
5  A.  Sure.
6  Q.  Is that agreeable?
7  A.  Yes.
8       Oh, by the way -- by the way, ma'am,
9  just so you're aware, I do have -- just to
10 make sure that you're aware of that, I do
11 have the then current Federal Motor Carrier
12 Safety Regulations in front of me.  That's
13 another document that I do have with me as
14 well.  So I just want to make sure you're
15 aware of that.
16 Q.  And if you reference that or different
17 sections, just let me know that you're
18 referencing it, but that's -- that's
19 acceptable.
20 A.  Sure.
21 Q.  All right.  So where I'd like to start with
22 you, if I may, Mr. Turner, is starting on
23 the third page after we get past your

Page 14

1  acronyms that you use in your report.
2  A.  By the way, I'm in a hotel room.  So if all
3  of a sudden you hear my dogs barking, just
4  give me a moment because they don't like
5  people walking down the hallway.  And I'm
6  only here for a couple of days, so it's
7  twice I'm deposing here this week alone.
8  Q.  I understand.  And we'll do so.
9       All right.  So looking on your report,
10 the bottom of page 3 and continuing onto
11 page 4, I'd like to ask you about that
12 sentence that starts with apply the
13 knowledge.  Do you see which sentence I'm
14 referencing?
15 A.  You're saying on page 3?
16 Q.  At the very bottom of page 3 of your
17 report.
18 A.  The assignment?
19 Q.  Oh, I'm sorry.  It actually shows it -- so
20 it's numbered page 3, but it's actually, I
21 believe, the fourth page of your report.
22 Do you see that on the screen?
23       And I'm not sure why --

Page 15

1  A.  Well, you're on the same --
2  Q.  -- the page numbers show that.
3  A.  Yeah.  Your images are covering up the page
4  numbers on me, so I don't see -- I can tell
5  you that if you look at Assignment 4.0 --
6  it's assignment, then it's two lines, and
7  it has the undersigned -- it's exactly what
8  you have there.
9  Q.  Right.  So do you see where it says apply
10 the knowledge, experience, and education?
11 Do you see that?
12 A.  Oh, okay.  You're jumping in the middle of
13 a paragraph.  Okay.  I apologize.
14 Q.  Yes.
15 A.  I'm always looking at the beginning of a
16 paragraph when you're referring to
17 something --
18      (Brief interruption due to
19       overlapping speakers.)
20      THE WITNESS:  I understand.  My
21      shins have healed up real
22      nicely since doing non-live
23      depositions because of court

Page 16

1      reporters kicking me under the
2      table.
3  Q.  (By Ms. Baugh:)  Okay, Mr. Turner.  So the
4  language starting at the bottom of page 3
5  that goes over onto page 4 where you say
6  that you are applying the knowledge,
7  experience, and education along with
8  standards of care and the FMCSR, what I'd
9  like you to identify, please, sir, is what
10 standards of care are you identifying.
11 A.  Well, in this report here -- you know, and
12 I made this note earlier when I was
13 reviewing the report again -- is that I
14 would actually like to more refer to it as
15 best practices as opposed to standards --
16 so wherever we see standards of care, I
17 would more reflect -- be reflective upon
18 best practices.  That's where a lot of --
19 standards of care and/or best practices.
20 And this particular part here doesn't say
21 that, but you'll see throughout the report
22 it does say standards of care and best
23 practices.

Page 17

1  Q.  Okay.  And what is the source, then, of the
2     best practices that you were applying for
3     this opinion?
4  A.  Well, best practices would be from a
5     combination of my years of driving
6     commercial motor vehicles, responding to
7     commercial -- over a thousand commercial
8     motor vehicle crashes, tests hundreds of
9     times in this universe of what we do here,
10    in addition to enforcement, roadside
11    enforcement inspections.  And so, you know,
12    that's pretty much the larger part of what
13    would be best practices.
14 Q.  Okay.  So when you're saying best practices
15    or the times in the report where it says
16    standards of care, understanding you want
17    that to be interpreted as best practices,
18    you're referencing your own experience.  Is
19    that fair?
20 A.  Well, my own experiences as well as the
21    testimony within the report -- within this
22    case here as well.  For example, you have
23    Mr. Ross talks about that he offered to

Page 18

1     give up straps to the loader.  The loader
2     refused them.  So to me in my mind, the
3     best practice would have been to accept
4     those straps and install them or simply,
5     you know, use your own straps, which he
6     didn't do.
7        So that's where I'm looking at.  This
8     is a best practice.  Because when you
9     don't -- when you can't pair it up to a
10    regulation, then you have to look at
11    something, and it's something -- would be
12    something similar to a best practice.
13 Q.  Okay.  But in the example you just gave,
14    the best practice is your opinion of what
15    should have happened?
16 A.  Correct.
17 Q.  Okay.  And you continue that sentence.  So
18    after the semicolon, you are drawing from
19    the universe of information collected and
20    known by the undersigned to form the
21    opinions regarding the applicability of the
22    FMCSR and the standard of care as it
23    pertains to shippers.

Page 19

1        So looking at that clause, you are
2     applying -- I'm sorry?
3  A.  No.  Once again, under standards of care it
4     would be -- so let's use the term and/or
5     best practices throughout the entirety of
6     the report.
7  Q.  Okay.  I will try to make sure to read that
8     in where it is not, but, yes, understood.
9  A.  I'll remember.
10 Q.  So for your opinions, your opinions are
11    also setting out what you believe to be the
12    application of the Federal Motor Carrier
13    Safety Regulation to these facts.  Is that
14    accurate?
15 A.  Well, yes, I mean, in terms of duties.
16       And by the way, when we get further in
17    through this, when I refer to the term
18    "duty" anywhere in the report -- that's
19    another caveat here -- is that I'm
20    referring to it -- I'm not referring to it
21    from a legal standpoint, from a legal --
22    what a jury would be charged with or what a
23    judge is going to determine or an attorney.

Page 20

1     It's not from Black's Law Dictionary.  What
2     it simply is from, it's from Oxford --
3     Oxford Dictionary where, number 2, it says
4     a task or notation -- or excuse me -- a
5     task or an action that someone is required
6     to perform.
7        So I want to make sure that, you know,
8     we're clear on that, that I'm not -- I'm
9     not giving opinions -- legal opinions.
10 Q.  But if someone is required to perform that
11    action, who is requiring the performance?
12 A.  Well, I'm not quite certain I follow what
13    you're saying in relation to what I just
14    stated.
15       MS. DYE:  Object to form.
16 Q.  Well, you stated that when you use the word
17    "duty" you are not meaning it in a legal
18    sense but that you mean it to be a required
19    action or a requirement to perform.  So who
20    is requiring that action or performance?
21 A.  Well, according to -- according to Knauf --
22    Knauf personnel, you have one individual
23    that goes out and loads it, and he's got

Page 21

1    the authority -- appears to be the sole
2    authority on whether it was safely loaded
3    or not.  And then when he's offered a set
4    of straps, he rejects the set of straps and
5    says, I have my own.
6        So, yeah, I mean, I look at that and
7    say that right there to me in my mind would
8    be required to perform.  As I said it
9    stated in the definition, a task or action
10   that someone is required to perform.
11       He was required to perform that because
12   he had been notified on multiple -- or they
13   had -- Knauf had been notified on multiple
14   occasions from CABP that the articles of
15   cargo -- and that's what I refer to them
16   as, insulation, whatever you'd like to
17   refer it -- but the articles of cargo on
18   the semitrailer on multiple occasions -- I
19   think there was something like 24
20   complaints -- that there was a cascading of
21   these things coming out.
22       So does the -- in my definition of duty
23   as being a standard -- you know, Oxford

Page 22

1    Dictionary duty, would they have the duty
2    as a task or action that one is required to
3    perform, yeah.  In my opinion, yes, they
4    are required to do that because the driver
5    didn't have opportunity to watch a live
6    load.  He was told to go sit in your truck
7    and just wait there.  Here's my strap.
8    They deny the straps, said we have our own.
9    So he had a right of reasonable assumption
10   that the articles of cargo were adequately
11   secured in accordance with 392.9.
12   Q.  So who's requiring the action?  You?
13   A.  Am I requiring it?
14       No.  No, ma'am.  That would have
15   been --
16   Q.  All right.  Then who in that example that
17   you gave -- who is requiring the action?
18   A.  The action is being required because the
19   straps were offered -- as I stated, they
20   were offered to the Knauf individual that
21   was loading, the loader, as stated by
22   Weldon.  They were offered to him, and he
23   rejected them.

Page 23

1        So that's what I'm saying, is that he
2    would be required to perform this -- I
3    mean, it's -- you know, I guess it may kind
4    of be a parsing of words, but he is
5    required to perform to make sure that
6    those -- if he's going to seal that trailer
7    and the driver then has the right of
8    reasonable expectation because he was told
9    I don't want your straps, we have our
10   own -- he's got the right of reasonable
11   expectation to look at that and say
12   apparently that's well secured, the
13   articles of cargo have been adequately
14   secured.
15   Q.  So are you saying Mr. Ross is requiring the
16   action in this case?
17   A.  Who?
18   Q.  Mr. Ross, the plaintiff.
19   A.  No.  No, I didn't say that.
20   Q.  Okay.  So you're telling me that when you
21   use the word "duty," you're not saying it's
22   a legal requirement.
23   A.  Correct.

Page 24

1    Q.  But I'm trying to understand who, then, is
2        placing the requirement, because for a
3        requirement to exist it has to be created
4        by someone or, you know, an entity.
5            Who is creating this requirement that
6        you are setting forth as the duty?
7            MS. DYE:  Object to the form.
8    A.  Well, it's a requirement to wear a seatbelt
9        in a vehicle while you're driving.  If you
10       choose not to, that's your own negligent --
11       so it's -- it's not a -- it's not something
12       you can look at and say that there is a --
13       because Weldon says that the only time that
14       they apply straps is when a customer asks
15       for that, asks to have straps applied, but
16       yet he knew -- clearly knew that multiple
17       times there was cascading events.
18           So in my line of thinking and in my
19       expertise, I look at that and say that
20       would place the burden of the -- the duty,
21       again, being -- Oxford Dictionary -- a task
22       or action that someone is required to
23       perform -- that's where I come in with the

Page 25

1   requirement aspect.
2       If you're asking me to point to you a
3   specific Alabama law or a Georgia law or a
4   Scott Turner law or any other thing like
5   that, I can't -- I can't do it.  This is
6   not an ipse dixit issue here.  This is --
7   this is just something -- this is something
8   that is logically -- and this is what the
9   suit is all about.  Because you have a
10  shipper that apparently doesn't apply the
11  safety mechanisms that they should have
12  applied because they just didn't feel it
13  was necessary and they just kept on saying
14  "no," even though they were offered straps.
15  And they were told, no, we don't want your
16  straps, we have our own, go sit in your
17  truck and wait up there.
18      So to me it's a reasonable expectation
19  that the professional CMV driver, Mr. Ross,
20  who comes from a motor carrier, Heartland,
21  that has an outstanding safety record.  If
22  you look at their MSS -- SMS -- I'm
23  sorry -- SMS data, they have an outstanding

Page 26

1   safety record with an incredibly low driver
2   out-of-service rate.
3       So if you look at all these things, you
4   know, in an entirety, this is how I come up
5   with that opinion.  Now, is there something
6   that sits there and says that specifically
7   that a shipper has a required --
8   quote/unquote, required to perform, no.
9   But logically I look at it and say that the
10  shipper should have, quote, performance --
11  and they represent it to the driver
12  logically that it was performed by stating
13  we don't need your straps, we have our own.
14      In addition, it would be completely
15  nonsensical for Mr. Ross to pull the CMV
16  forward, doors get -- it gets closed on the
17  semitrailer, and then they put a seal on.
18  He pulls the truck out 5 feet and says,
19  give me your bolt cutters, I'm going to
20  open this up and I'm going to inspect it.
21  That's just -- that's just nonsensical.
22  Because they just got done putting the seal
23  on there and they stated we don't want your

Page 27

1   straps, we have our own.
2   Q.  What testimony are you relying on to say
3       that Knauf said I don't want your straps,
4       we have our own?
5   A.  Sure.  Hold on.
6       Okay.  It is deposition testimony,
7       page -- on Ross, 224, slash, 23, and it's
8       on the deposition of 2-28-24.  And if you
9       read, it says -- let's see here.
10      And it's on my page 5 if you want to
11      follow along.  My page 5, the middle
12      paragraph there, the third paragraph down,
13      and I'll read it into the record.  And this
14      is our wording first, and then it goes into
15      the deposition.
16      Professional CMV driver Ross gave sworn
17      testimony -- excuse me -- deposition
18      testimony as to the occurrences of his
19      arrival at Knauf and the direction he was
20      provided by Knauf employee on site.
21      Question:  Who did the black
22      gentleman -- I went up.  I went up.  There
23      was another driver ahead of me, so he

Page 28

1   took -- so he took care of him.  And then I
2   told him who I was and that I was there --
3   what I was there for.  And I had two straps
4   with me because the dispatch required --
5   the dispatch required -- required me to
6   supply two load straps.
7       And here's the important part.
8       And I had the two load straps with me
9   and -- and I presented them to him.  And he
10  told me that he -- they already had some,
11  that they didn't need them and that the
12  trailer was -- and that the trailer wasn't
13  quite ready yet --
14      THE WITNESS:  I have a tendency to
15          read fast and do that to the
16          court reporter.
17  A.  -- to go back and wait in my -- wait in my
18      truck.
19      So he's told we don't need your straps,
20      we don't want your straps, we have our own,
21      go back in your truck and wait, as I had
22      stated earlier.
23  Q.  Okay.  Well, wait.  That last part is your

Page 29

1  paraphrasing.  But in terms of Mr. Ross'
2  testimony, that's what you're relying on?
3  **A.  No, I'm not paraphrasing.  That's actual**
4  **testimony where it says to go back out and**
5  **wait in my truck.  So he waited in his**
6  **truck for about an hour and a half.**
7  Q.  Yes.  But then you went into a paraphrasing
8  and summary.
9      So the quoted testimony from Mr. Ross
10  is what you're relying on to represent that
11  Knauf did not want to use Mr. Ross' straps.
12  That's the bases?
13  **A.  Sure.  I have no reason to dispute or**
14  **challenge the veracity of his testimony.  I**
15  **mean, that's not my job.  That's to the**
16  **trier of the facts.**
17  Q.  I am simply trying to confirm what the
18  bases is for what you're relying on.
19  **A.  Oh, sure.  I understand.**
20  Q.  Okay.  So going back to what we were
21  talking about with the duty, though, you
22  are saying you are not citing -- when
23  you -- when you're identifying a duty, you

Page 30

1  are not citing to a legal duty?
2      MS. DYE:  Object to the form.
3  **A.  That's correct.  If you open up Black's Law**
4  **Dictionary, you put Oxford next to --**
5  **beside it, I'm referring to the second**
6  **paragraph -- or the second definition under**
7  **Oxford.**
8  Q.  Okay.
9  **A.  And, again, would you want -- would you**
10  **like me to read that back into the record**
11  **again?**
12  Q.  No.
13  **A.  It's basically, number 2, a task or action**
14  **that someone is required to perform.**
15  **And because Knauf did not require that**
16  **performance does not mean that it is not an**
17  **act of carelessness or negligence.**
18  Q.  You said it does or does not?
19  **A.  No.  What I said is that because Knauf does**
20  **not require the securement, it does not**
21  **mean that it -- what they are doing is not**
22  **an act of negligence, what they are failing**
23  **to do is not an act of negligence.**

Page 31

1  Q.  So you're determining --
2  **A.  And/or carelessness.**
3  Q.  So you are opining as to whether Knauf was
4  negligent?
5  **A.  Not in -- again, not in a legal definition.**
6  **And we can go back to Oxford.  I use my**
7  **term -- definitions out of Oxford**
8  **Dictionary.**
9      **So if we want to look at negligence,**
10  **I'm not saying from the legal standpoint**
11  **the different levels of negligence from**
12  **Black's Law Dictionary and/or State of**
13  **Alabama or even from the United States**
14  **District Courts.  What I'm saying is that**
15  **negligence -- just the simple negligence --**
16  **just means to me is that someone did not do**
17  **something that they were supposed to do.**
18  Q.  Okay.  And what is creating the something
19  they're supposed to do?
20  **A.  The something they were supposed to do was**
21  **to make sure that they were applying the**
22  **necessary straps to secure the articles of**
23  **cargo from relative motion/shifting at any**

Page 32

1  **point in time throughout transport from**
2  **point A to point B to Cordele, Georgia, and**
3  **they failed to do so.  Because they didn't**
4  **have a policy in place doesn't release them**
5  **of that duty.**
6  Q.  Okay.  So you have identified an obligation
7  for Knauf to secure the load.  What creates
8  that obligation?
9  **A.  Again --**
10      MS. DYE:  Object to the form.
11      Asked and answered.
12  **A.  -- it's a matter of making sure that the**
13  **people that are coming to their facility --**
14  **coming to their -- or to their facility or**
15  **they're transporting a load that they**
16  **loaded, it's a matter of their requirement**
17  **to make sure that they have secured those**
18  **articles of cargo that they're representing**
19  **to the driver -- that's the important**
20  **part -- that they're representing to the**
21  **driver that they have secured the load.**
22  **And by way of Ross, again, being told**
23  **we have our own straps is a reasonable**

Page 33

1  expectation for Mr. Ross to say clearly
2  they are going to be securing the load.
3  And it's not a live load. It's a load
4  where he has got to sit in his truck
5  tractor, not allowed to make observation,
6  and it's as simple as that.
7  Q.  Okay. So it is Knauf's obligation to
8  secure the load because Mr. Ross expected
9  it to be done that way?
10     MS. DYE:  Object to the form.
11  A.  No. Because they referenced that they were
12  going to secure the load by stating that
13  they have their own straps. We don't need
14  your straps. We have our own.
15  Q.  And so you interpret that to mean Knauf was
16  telling Mr. Ross this load will be secured
17  with straps?
18  A.  It's a reasonable expectation, yes.
19  Q.  And that is your reasonable expectation?
20  A.  Clearly was Mr. Ross' reasonable
21  expectation as well.
22  Q.  Why do you say that?
23  A.  Because he took the CMV to the -- from

Page 34

1  point A to point B with articles of cargo
2  that he was under the understanding was
3  secured. He took it from point A to
4  point B to Cordele, Georgia, where he
5  opened up the back of the semitrailer and
6  the articles of cargo cascaded onto him, of
7  which, again, Knauf had been warned about
8  this multiple times.
9  Q.  What are you relying on for Mr. Ross'
10  understanding?
11  A.  I'm sorry?
12  Q.  What are you relying on to identify
13  Mr. Ross' understanding?
14  A.  His testimony.
15  Q.  What part of his testimony says he
16  understood the load was secured with
17  straps?
18  A.  That's not exactly what I said. What I
19  said was -- bear with me a second. I'll
20  have to find it again.
21     I just read it into the record a moment
22  ago. I'll read it back in again.
23     (Brief interruption by the

Page 35

1     videographer.)
2  A.  Okay. Again, page -- on Ross deposition
3  transcript page 224, line 23, it starts
4  out. And it starts out with I don't know
5  the gentleman's name. All right. And then
6  I'm going to skip -- I'm going to skip down
7  to the more substantive part which is
8  underscored in the report on page 5.
9     It says: And I had the two straps with
10  me and I presented them to him and he told
11  me that they already had some, that he
12  didn't need them.
13     So I draw a conclusion from that saying
14  that they were intending or forgot to put
15  straps on. I don't know which of the two
16  it is, but this -- and I have no reason to
17  doubt the veracity of Mr. Ross' testimony.
18  Q.  Okay. So understanding that's your
19  inference, my question was, what are you
20  relying for a factual basis that Mr. Ross
21  understood that there would be straps on
22  the load?
23  A.  Again, I can only base it on what I've read

Page 36

1  in testimony.
2  Q.  Okay.
3  A.  Now, is it an absolute black-and-white
4  issue?
5     Again -- once again, I do not have the
6  right as an expert to exclude the testimony
7  of Mr. Ross and just say I don't believe
8  him. You know, it's just not -- there's no
9  issue of falsus in uno, falsus in omnibus
10  here. I mean, I just don't -- I don't get
11  into that.
12  Q.  That wasn't the question. My question is
13  just for you to identify what it is that
14  you're relying on to identify what Mr. Ross
15  understood, and you stated that Mr. Ross
16  understood there to be straps. So if
17  you're only basing it on the testimony that
18  you've pointed back to of Mr. Ross, that's
19  fine. Is that it?
20  A.  And I -- I said -- I apologize if I didn't
21  say that multiple times. I thought I did.
22  Q.  Okay. Let's go to page 10 of your report.
23  A.  Okay.

Page 37

1   Q.  Okay.  You have -- scrolling down after a
2       section break, I suppose, the paragraph
3       that begins with "Due" -- do you see this
4       paragraph?
5   A.  Yes.
6   Q.  All right.  You have:  Due to specific
7       loading circumstances regarding the subject
8       CMV semitrailer -- in parentheses,
9       semitrailer sealed, load straps refused,
10      and Ross directed to wait in truck
11      trailer -- it is highly probable the
12      shipper, Knauf, accepts the burden and/or
13      responsibility of adequate securement of
14      the articles of cargo within the subject
15      CMV semitrailer.
16          Do you see that statement?
17  A.  I do.
18  Q.  Okay.  What do you mean by the phrase
19      "highly probable" in that sentence?
20  A.  Well, highly probable means that it's not
21      absolute.  Highly probable means it's
22      almost absolute.  Then you have -- we use
23      different terminology dependent upon a

Page 38

1       level -- you know, if we said it's
2       probable, a much higher degree of that is
3       highly probable -- highly probable.  Excuse
4       me.
5           So where it says it is highly probable
6       the shipper, Knauf, accepts the burden and
7       the responsibility of adequate securement
8       of the articles of cargo within the subject
9       semi -- CMV semitrailer -- so when we say
10      highly probable, it's highly probable
11      because the loader came right out and said
12      to Mr. Ross don't worry about your straps,
13      we have our own, go sit in your truck and
14      wait there.
15  Q.  Okay.  Are you applying a standard to reach
16      your highly probable conclusion?
17  A.  I fall back on my response before.  It's
18      based on testimony.  And I have -- I have
19      the reasonable right to read testimony and
20      apply it to the cases as I see fit, and
21      that's what I'm doing.
22  Q.  Wait.  When you say read the testimony and
23      apply it to the cases as you see fit, I

Page 39

1       don't understand what you mean by applying
2       it to the cases.
3   A.  So in other words, cut and paste.  What I
4       just read into the record -- and I'll go
5       back and read it again if you'd like.
6   Q.  No, no, no.  I'm just trying to understand
7       when you say that you're applying testimony
8       to the cases.  I don't understand what you
9       mean by applying it to the cases.  I just
10      want to understand what you said as to that
11      part.
12  A.  Sure.  I take the entirety of all of this
13      discovery that's listed on the back of the
14      report -- the entirety of -- we look at the
15      entirety of all discovery in a report.
16      Then we look at the regulations, standards
17      of care, et cetera, whatever may apply to a
18      particular crash or incident involving
19      commercial motor vehicles.  We take all
20      that testimony.  We take everybody -- we
21      take everything into consideration.  We put
22      it in a big pot, mix it up, and then we
23      pour a report out of it at the end.  And

Page 40

1       that's what we did here.
2           So I have taken testimony of
3       Mr. Ross -- and, again, of whom I have no
4       authority to presume he was disingenuous or
5       anything.  I have to take that report, cut
6       and paste things that I see and feel are
7       applicable to the -- and seminal issues to
8       the crash or the incident, and then apply
9       it.  That's what I'm talking about.
10  Q.  Okay.  And so in this case for this
11      statement that we're talking about, the
12      "due to the specific loading
13      circumstances," et cetera, I asked you
14      whether or not you were applying a
15      standard, and you said, no, just testimony.
16      So this opinion is based off of your review
17      of the testimony?
18  A.  That's correct.  That's based on my review
19      of the testimony.  That's based on the fact
20      that the motor carrier does not permit
21      their drivers to cut the -- just
22      arbitrarily cut a seal, and he had no
23      authority to do so.  I mean, this is --

Page 41

1  with that term of things -- you know,
2  articles of cargo falling off the back of a
3  trailer.  Because you pull into a truck
4  stop and you cut that seal just to go back
5  and take a look at it without the
6  authority -- and Weldon -- Weldon himself
7  even -- even suggested to the fact that --
8  you know, that you can't just arbitrarily
9  cut a seal.
10 Q.  Which testimony of Mr. Weldon are you
11    relying on to say that Mr. Ross was not
12    allowed to cut the seal?
13 A.  I didn't say not allowed.  I didn't say
14    that.  Hold on one second here.
15       Okay.  Here it is.  This would be CW,
16    so it's Mr. Weldon, page 107 -- transcript
17    page 107, line 1.  It says, question:
18    Okay.  So he comes out and he's got a
19    sealed trailer and he hooks up to that
20    trailer and drives away.  Is that generally
21    the process?
22       Answer:  Once he picks up the
23    paperwork, yes.

Page 42

1        Question:  Okay.  So prior -- but
2    because it's sealed, he has no opportunity
3    to inspect what's inside this trailer
4    before he drives away; right?
5        Correct.
6        Question:  All -- all right.  Now,
7    obviously if he can't look inside the
8    trailer, he can't -- he can't know whether
9    or not there's load straps or other safety
10   equipment used, can he?
11       Correct.
12       And then he says -- a little further
13   down he says that he won't know -- he won't
14   know it until -- unless he opens the door.
15       And then it goes on to say on the
16   second question -- this is on page 12, by
17   the way, of my report.
18       Question:  And -- let's see.  So it's
19   solely the responsibility of the loader --
20   warehouse associate to make sure that it's
21   stacked correctly?
22       Answer:  Yes.
23       Question:  And is there anybody other

Page 43

1    than you who would make sure that the
2    loaders were loading the product the way
3    that Knauf wanted the product to be loaded?
4        No.
5        So they took a loader and just said,
6    here, have at it, make sure it's stacked in
7    there properly.  And then he goes over to
8    Mr. Knauf -- and the jury -- you know,
9    I believe that the jury would take this
10   with some demonstrable evidence and just be
11   able to look at this and say, wait a
12   second, they just sent the driver away and
13   said go sit in your truck, we don't want
14   your straps, we have our own.  So what does
15   that imply?  That they are going to secure
16   articles of cargo in the back of this
17   semitrailer.
18 Q.  Okay.  You stated that motor carriers don't
19    allow their drivers to just cut the seal --
20    I believe you said willy-nilly.  What are
21    you relying on for that statement?
22 A.  Well, Heartland -- Heartland doesn't allow
23    that.

Page 44

1        And, by the way, I never used the term
2    "willy-nilly," but that's quite all right.
3        Heartland -- Heartland does not permit
4    their drivers to just go back and cut
5    straps -- excuse me -- cut seals.  They
6    just don't allow it.
7        No motor carrier does that, by the way,
8    that I know of, and I've been doing this
9    kind of work for a long, long time.
10   Because if you cut those seals, you've now
11   subjected that -- those articles of cargo
12   to theft.  And that's the whole reason that
13   the seal is placed there, for no other
14   reason than theft, as a theft deterrent.
15 Q.  What are you relying on to say that
16    Heartland does not allow its drivers to cut
17    the seals?
18 A.  I don't recall exactly where I -- where
19    that came from, but she -- there was
20    some -- there was something -- something to
21    that effect that Heartland does not permit
22    the cutting of seals.  I -- and it would go
23    along with the standards of industry

Page 45

1   practice.  They don't just allow drivers to
2   cut seals.
3       Normally what happens if a driver has
4   any degree of suspicion of the articles of
5   cargo being loaded improperly or what have
6   you, unsecured, then what would happen is
7   that they can call their dispatch, dispatch
8   calls the consignor, they call the broker,
9   they call the motor -- the shipper and say
10  our driver wants to cut that strap -- the
11  seal.  And at that point they can act
12  accordingly.  But that's normally what
13  would happen.  It wouldn't be just a driver
14  arbitrarily going up to a shipper and
15  saying I want to cut the seal.
16      He just understood -- Ross understood
17  that these articles of cargo, this
18  insulation, was secured because, you know,
19  he had a right of reasonable expectation
20  that it was properly and adequately secured
21  based on the fact that they were -- they
22  said that -- or the loader said that I
23  don't want your straps, don't need your

Page 46

1   straps, I have my -- we have our own, thank
2   you very much, go back to your cab.
3   Q.  Okay.  When you testified just now as to
4   what Mr. Ross understood in his reasonable
5   right of understanding, that's based on
6   your opinions to the testimony that you've
7   read?
8   A.  Yes.
9   Q.  Thank you.
10      Okay.  Looking back at the page that we
11  have up here, page 10 of your report.  We
12  read the first sentence of that paragraph.
13  Moving on to the second one, the one that
14  starts "more specifically."
15      So it says:  More specifically,
16  regulatory guidance as well as industry
17  standards of care and/or best practices
18  provide that when a shipper seals the CMV
19  semitrailer, their known responsibility as
20  to adequate cargo securement are
21  heightened.
22      All right.  I want to break that down
23  some.

Page 47

1       What regulatory --
2   A.  Let me read the entirety of that paragraph
3   because you kind of jumped in the middle
4   someplace before I had a chance to find it,
5   and I wasn't really, you know, paying
6   specific attention.  And I like to read
7   things myself because it makes a little
8   more sense to me.  So let me just read that
9   paragraph real quick, if you may -- if I
10  may.
11      Okay.
12  Q.  All right.  In the sentence that we've just
13  referenced, what regulatory guidance are
14  you referencing?
15  A.  Well, as I stated earlier, I'm not relying
16  upon -- I'm relying on testimony.
17  Q.  Okay.  But that sentence specifically
18  says --
19  A.  It says right there -- it says right there
20  load straps refused.
21  Q.  Okay.
22  A.  It says --
23  Q.  Sir --

Page 48

1   A.  See, that's why I always like to read
2   everything in context and just not jump in
3   the middle of something because it could be
4   taken out of context.  Because what it
5   says:  Due to specific loading
6   circumstances requiring the subject CMV
7   semitrailer -- and then it says in
8   parentheses, semitrailer sealed, load
9   straps refused, and Ross directed to wait
10  in the truck tractor.
11      So you can't -- you can't just jump in
12  the middle of that paragraph and -- you
13  know, I'm trained to make sure that -- I
14  trained myself to make sure that I take
15  everything in full context and not just
16  jumping in the middle of the paragraph
17  because it can have very different meaning
18  if not put in full context.
19  Q.  Sir, that is not responsive to my question.
20      My question was, the second sentence of
21  the paragraph that you just referenced
22  starts, more specifically, regulatory
23  guidance, and it continues.

Video Deposition of Scott Turner                    7/25/2024
13 (49 - 52)

Page 49

1    My question is simply for you to
2    identify what regulatory guidance you are
3    using in that sentence where you say, more
4    specifically, regulatory guidance.
5  A.  Okay.  What you're missing is a very
6    important word once again.  Okay.  More
7    specifically, regulatory guidance as well
8    as industry standards of care and/or best
9    practices.
10     We're relying upon best practices.  We
11   know within industry standards that
12   articles of cargo -- excuse me -- within
13   industry standards as well as regulatory
14   guidance that articles of cargo must be
15   adequately secured.  We know that.  And
16   that's under 392.7.  It states that very
17   specifically.
18     And then you have exception -- you
19   have -- in the interpretation section you
20   have some (audio distortion) --
21     (Brief interruption by the court
22       reporter.)
23  A.  Okay.  All right.  So let me start over.

Page 50

1    Where it says it is highly probable
2    that a shipper, Knauf, accepts the burden
3    and the responsibility of adequate
4    securement and articles of cargo within the
5    subject CMV truck -- more specifically --
6    to your question, more specifically,
7    regulatory guidance as well as industry
8    standards of care and best practices
9    provide that the shipper seals the CMV
10   semitrailer.
11     All right.  Again, that's why it says
12   "and/or."  It's not -- it's not -- it
13   doesn't say "and."  It doesn't say "or."
14   It says "and/or."  It's one or the other.
15     So one of the three of those are going
16   to be applicable.  We know based on a
17   regulatory requirement, the regulatory
18   department under FMCSR 392.7 -- and, by the
19   way, 393.100 -- that the articles of cargo
20   must be adequately secured.  They were not
21   adequately secured, and it was
22   represented -- and that's the -- I think,
23   you know, you and I have a little struggle

Page 51

1    with that -- is that it's represented by
2    Knauf's employee, the loader, that we have
3    our own straps.  That to me would mean --
4    is that I'm going to be driving a semi --
5    this is his first -- this is Ross' first
6    time there; all right?
7      He's going to be operating and pulling
8    a load that has been properly and
9    adequately secured, which then it's sealed.
10   So there's no sense in my mind for him to
11   have to pull 10 feet out away from the --
12   away from the bay doors and say I'm going
13   to cut the seal you just put on after you
14   just got done telling me that you have your
15   own load straps, you don't need mine.
16  Q.  The regulatory guidance that you're
17   referencing there is Federal Motor Carrier
18   Safety Regulation 392.9?
19  A.  Correct.
20  Q.  All right.  And the industry standards of
21   care and/or best practices, you've
22   previously said that's based upon your
23   experience?

Page 52

1  A.  I'm sorry.  One more time.  You broke up
2    there.
3  Q.  In the sentence that we are looking at, the
4    more specifically, regulatory guidance as
5    well as industry standards of care and/or
6    best practices, the industry standards of
7    care and/or best practices portion of that
8    sentence, that is based upon your
9    experience?
10  A.  The best practices is -- if you look at a
11   best practice -- so best practice, we can
12   go and we can look at 393 -- and that's not
13   listed in here on the back of the report.
14     But if you look at 393.100, it will
15   specifically address load securement.
16   Okay.  It talks about chains and cables and
17   straps and dunnage bags, DID bags, all
18   kinds of other things, blocking, bracing,
19   et cetera, et cetera.
20     So if you're looking at that, that is
21   to me industry standard.  That's the
22   industry standard under -- from a
23   regulatory standpoint, 392.9 puts that

Page 53

1   burden onto the driver, only receiving
2   relief from that requirement under the
3   regulation if the driver is not able to
4   access the sealed load.
5       And, again, if -- let me put it this
6   way.  They're switch loads; okay?  A switch
7   load.  So if Mr. Ross picked up this load
8   and he brought it from its origin at Knauf
9   and he took it to Cordele -- he didn't take
10  it quite to Cordele, Georgia.  Say that he
11  took it to Atlanta, Georgia.  It's an
12  interstate commerce movement, so therefore
13  the full regulations apply.
14      So he takes it to Atlanta, Georgia.
15  Another truck comes up and picks up and
16  connects to that semitrailer through -- it
17  couples to this semitrailer and takes it to
18  Cordele, Georgia.  That -- then that driver
19  now has the duty -- yes, he may have to cut
20  the seal on that.  And if he does cut the
21  seal -- if he suspects that there's any
22  kind of relative motion issues where you
23  don't have securement and the cargo is

Page 54

1   leaning up against doors and walls and
2   things like that, you know, he may have to
3   call his dispatch and say I need to cut
4   this load.  And I've seen that happen as
5   well.  And then he puts a lock on that
6   afterwards to prevent theft.
7   Q.  Okay.  In the sentence that we're looking
8   at, what are the known responsibilities
9   that you are referencing?
10  A.  Okay.  I'm just trying to read where you
11  were.
12      So known responsibility -- known
13  responsibility is going to be something
14  that the shipper clearly accepted the fact
15  that they had a -- they had loads and
16  articles of cargo that were not loaded to
17  the extent that they were adequately
18  secured.  So that's -- that would fall back
19  on the responsibility -- when the driver --
20  when the loader says to Mr. Ross, we got
21  it -- and, again, I'll fall back on this
22  all day long -- we got it.  We have the
23  straps.  We don't need yours.  Put them

Page 55

1   away.  So that responsibility now becomes
2   the responsibility of the loader, therefore
3   Knauf.
4   Q.  Okay.  So when you're talking about known
5   responsibilities in that sentence, you are
6   referencing load securement?
7   A.  Well, let's read it one more time just to
8   make sure I'm in perfect context.
9       More specifically, regulatory guidance
10  as well as industry standards of care
11  and/or best practices provide that when
12  a -- when a shipper seals the CMV
13  semitrailer their known responsibilities as
14  to adequate control [sic] securement are
15  heightened.
16      They're heightened because they assumed
17  that duty simply by stating -- that's where
18  their responsibility is.  And they accepted
19  that duty to secure the articles of cargo
20  effectively, and they didn't.  What they --
21  they accepted that by stating that we have
22  our own straps, we don't need yours, get up
23  in your truck tractor, take a nap, and

Page 56

1   we'll talk to you in a little while.
2   Q.  Okay.  I'm just trying to identify what it
3   is that constitutes a known responsibility,
4   and in this case, in this sentence, you are
5   referencing load securement?
6   A.  Known responsibility.  Known -- at 393.100,
7   that's -- I forget the subpart.  But
8   393.100 specifically talks about, again,
9   the articles of cargo must be secured in a
10  specific manner.  That's what I'm referring
11  to there.
12      Then the duty falls back over to the
13  392 part, 392.9 specifically, where the
14  driver has the duty to make sure that the
15  articles of cargo are adequately secured.
16  However, the shipper sealed the load, and
17  they notified -- they notified Mr. Ross we
18  have our own straps, we don't need yours.
19  That to me is very, very, very powerful.
20  Q.  When you say responsibilities are
21  heightened, what do you mean by heightened?
22  A.  Well, they've been put on notice multiple
23  times that their articles of cargo fall out

Video Deposition of Scott Turner
7/25/2024
15 (57 - 60)

Page 57

1    of the trailer all the time.  So that to me
2    would be -- they should be on a heightened
3    alert as to this problem and provide simple
4    strapping that's going to prevent the
5    articles of cargo from toppling, cascading
6    out of the trailer when it's opened.  So
7    the driver is offering him a set of straps,
8    and he says, no, don't need them, got my
9    own.
10   Q.  Okay.  Heightened would generally mean more
11       than they were before; correct?
12   A.  I'm sorry?
13   Q.  Heightened would generally mean more than
14       it was before; correct?
15   A.  Well, I mean, heightened is heightened.  I
16       mean, allow the words to speak for
17       themselves.  I mean, you know, a heightened
18       alert.  You know, adequate cargo securement
19       are heightened.
20          It's always -- when you have any kind
21       of stacked cargo, articles of cargo in the
22       back of a semitrailer, you need to be on a
23       heightened -- now, when he's -- he's in a

Page 58

1    coffee break and he's having coffee.  Is
2    that a heightened level of alert for cargo
3    securement?  Of course not.  Kind of a
4    ridiculous statement.
5          But, you know, is it a -- is it a
6    requirement to be on a heightened level of
7    alert when you as the dockman said don't
8    need your straps?
9          Yeah, it kind of does put that burden
10       onto the shipper.
11   Q.  Okay.  Did you review Knauf's responses to
12       the interrogatories?
13   A.  Everything that's listed in the back here
14       we reviewed.  If you look at ...
15   Q.  Okay.
16   A.  Hold on.
17   Q.  Are you aware of how many --
18   A.  Hold on one second.  Hold on one second.
19       You asked a question.  Let me answer it.
20          So if you look at page 27, we reviewed
21       all the files that were on that page 27
22       there for a complete file for us insofar as
23       we were concerned.

Page 59

1    Q.  Who is "we" in the sentence?
2    A.  I've got -- I've got -- sure.  I've got
3        five colleagues that work with me
4        throughout the country, and I'm assigned on
5        every case with each one of my colleagues.
6        So we work -- each file we work together.
7    Q.  Okay.  Ultimately the opinions that are in
8        the report, though, are those of you;
9        correct?
10   A.  I own the opinions.  That's correct.
11   Q.  Okay.  And so to the extent your opinion
12       relies upon evidence within the documents
13       you reviewed, you've referenced it in the
14       report.  Is that accurate?
15   A.  Correct.
16   Q.  Okay.  Did you consider -- strike that.
17          I have seen in your report where you
18       reference guidance question 3 to section
19       392.9.  Did you --
20   A.  Where are you referring to, please?
21   Q.  Absolutely.  So if we look on page 11 of
22       your report, the bottom third or so -- let
23       me know when you're ready.

Page 60

1    A.  Yes, I'm ready.
2    Q.  All right.  You reference to the regulatory
3        guidance section of Federal Motor Carrier
4        Safety Regulation 392.9, specifically
5        question 3; correct?
6    A.  Correct.
7    Q.  All right.  Did you take into consideration
8        any of the other guidance questions or
9        answers for section 392.9?
10   A.  Well, I have it here -- that was the most
11       relative one.  But if you look at
12       question 4, which we didn't put in the
13       report, it says -- question 4 -- and I'm
14       reading this right out of the regulation.
15       And this is under DOT interpretive issue
16       392.9.
17          It says:  Is there -- question 4:  Is
18       there a requirement that the driver must
19       personally load, block, brace, and tie down
20       the cargo on the property-carrying
21       commercial motor vehicle he drives?
22          Guidance:  No.  But the driver is
23       required to be familiar with the methods.

Page 61

1    So did we put everything in here, no.
2    Did we put what was most relevant, yes.
3    Because if you look at this one here in
4    question 3, it says guidance -- which is in
5    the report on page 11.  It says:  Under
6    these circumstances, a motor carrier --
7    important word here -- may fulfill its
8    responsibilities for proper loading a
9    number of ways.  Examples are:  A, arrange
10   for supervision of loading to determine
11   compliance; or, B, obtain notation on the
12   connecting bill freight -- line freight
13   bill that the loading [sic] was properly
14   loaded.
15   Q.  And C is to obtain approval to break the
16   seal to permit inspection; correct?
17   A.  Correct.  That's on page 12.
18   Q.  Okay.  Did Mr. Ross do any of the three
19   examples that were in guidance question 3?
20   A.  No.  Because he had a reasonable
21   expectation that the shipper -- the
22   shipper's loader, as referenced by Weldon,
23   actually secured the articles of cargo

Page 62

1    because he rejected the straps from
2    Mr. Ross and said we don't need your
3    straps, go back to your truck, we have our
4    own.
5    So I base it on that.  And then I look
6    at that and say is there any logic at all
7    to a CMV driver -- professional CMV driver
8    that has a motor carrier with an excellent
9    reputation and an excellent safety
10   record -- is there any requirement for that
11   driver to pull his truck 10 feet away from
12   the loading dock, go back to the loading
13   dock to say give me a pair of wire cutters,
14   I'm going to open up the seal.  They're
15   going to turn around and ask him if he's
16   out of his mind; right?
17   Does he have a duty to do that?
18   No, he does not, especially when you
19   have a situation where if he had reasonable
20   expectation that the articles of cargo were
21   not secured -- that's the thing.  If he had
22   reasonable expectation that the articles of
23   cargo were not secured, then he has a

Page 63

1    requirement to go ahead and open it up.
2    There was nothing that led him to that
3    conclusion, because, again -- I know the
4    word index is going to be loaded with this
5    term -- but Mr. Ross had the right of
6    reasonable expectation by stating that I
7    was offered -- I offered my straps, they
8    rejected my straps and said we have our
9    own.
10   What does that mean?
11   What that means to me as a former
12   driver myself many years ago in another
13   life and having all the experience that I
14   have of thousands of commercial motor
15   vehicle crashes in my career, I take that
16   as the driver pretty much expected -- had a
17   reasonable expectation that the articles of
18   cargo were adequately secured before he
19   took this CMV load into commerce.
20   Q.  Okay.  Heartland did not undertake to
21   perform any of the three examples provided
22   in question 3 guidance to section 392.9;
23   correct?

Page 64

1    A.  I just -- I just answered that.  I mean --
2    Q.  No.  The first time you answered as to
3    Ross.  I'm asking as to Heartland.
4    Heartland.
5    A.  390.11 of the Federal Motor Carrier Safety
6    Regulations state that any duty and/or
7    prohibition of a driver is likewise that of
8    a motor carrier.
9    So in that case there, the motor
10   carrier relied upon Mr. Ross'
11   professionalism in determining that the
12   articles of cargo were adequately secured
13   by way of him rejecting -- the loader
14   rejecting the straps from Mr. Ross and
15   saying we have our own, we will put them
16   on, and then -- I guess that's all -- the
17   only way I can answer that.
18   Q.  Okay.  I would like to look at the bottom
19   of page 12 of your report.
20   A.  Sure.
21   Q.  The paragraph that starts with "however."
22   Let me know when you're there.
23   A.  Yeah, I'm there.

Page 65

1  Q.  Okay.  You within this paragraph talk about
2     industry best practices, standards of care
3     and/or logistical practicality would
4     suggest --
5  A.  Excuse me.  So it's not all chopped up
6     here, let me please read this real quick
7     and make sure that we're getting it in
8     context.
9  Q.  Okay.
10 A.  Okay.
11 Q.  Okay.  Within this paragraph, you are
12    referencing industry best practices and/or
13    standards of care or logistical
14    practicality.  What specifically are the
15    bases for those?
16 A.  Well, first of all, industry best
17    practices, if you're going to look at it in
18    terms of a motor carrier, they have a duty
19    to comply with 393.100.
20        Let me confirm that.  I'm pretty sure
21    it's 393.100.
22        Yeah.  Subpart (i).  Subpart (i),
23    protection against falling cargo, 393.100.

Page 66

1        So the motor carrier has a duty to
2     comply with this; okay?  The shipper does
3     not have a duty to comply with this.
4     However, it can be used as a basis of best
5     practices.  Because articles of cargo have
6     to be secured.  They have to be secured
7     before operating -- or before the articles
8     of cargo are taken into commerce by way of
9     commercial motor vehicle, motor carriage
10    operation.
11        So looking at subpart (i), they had --
12    irrespective of them not being held to
13    compliance, but at best practice, they're
14    assuming that role by saying leave your
15    straps in your truck, don't bring them, we
16    don't need them, we have our own, thank you
17    very much, go to sleep -- or go back to
18    your cab.
19        So that right there, 393.100,
20    subpart (i), would be that best practice
21    that we keep referring to.
22 Q.  All right.  Looking at page 13 of your
23    report.

Page 67

1  A.  Sure.
2  Q.  You give a description of the Cameron
3     Ashley facilities.  Did you actually go to
4     the site of Cameron Ashley's --
5  A.  No, ma'am.
6  Q.  -- Cordele location?
7  A.  No, ma'am.  You know, something like that,
8     there's no really -- no real reason for us
9     to go there.  It just doesn't make any
10    sense to run an invoice up for no reason.
11    It just -- sometimes we do; sometimes we
12    don't.
13 Q.  Okay.  At the bottom of page 14 and then
14    continuing onto page 15, you make reference
15    to --
16 A.  Let me read it, please.  Please allow me to
17    read it.  Thank you.
18        Okay.
19 Q.  All right.  On the bottom of page 14 and
20    continuing onto page 15 of your report, you
21    reference an email from Heartland relating
22    to best practices for opening trailer doors
23    that was sent to Knauf in 2019; correct?

Page 68

1  A.  Correct.
2  Q.  All right.  Why is this important to your
3     opinion?
4  A.  It was just because -- what it is, is it
5     demonstrates that -- when you read the
6     testimony of Ross -- and if you go to page
7     15 -- you read the testimony of Ross, he
8     pretty much did exactly what he was
9     supposed to do.  Unfortunately, the wind
10    caught the door, and when the wind caught
11    the door, he unfortunately had a cascading
12    of the articles of cargo onto him.  That
13    has happened numerous times under
14    Knauf-loaded CMVs, but they chose not to do
15    anything about it.
16 Q.  Okay.  Do you believe that as described in
17    the email from Heartland to Knauf that
18    represents best practices for opening a
19    tractor-trailer door?
20 A.  I believe that it's a good representation.
21 Q.  Okay.
22 A.  Would it be an exact representation if I
23    were to sit down and write it myself?

Page 69

1    Perhaps I'm going to tweak a word here
2    or there, but in general it's a good --
3    it's a good policy.
4    Q.  Okay.  Does it matter to your opinion
5    that -- whether or not this best practices
6    or this email from Heartland was ever given
7    to Mr. Ross?
8    A.  No.  But, again, based on -- based on
9    the -- based on his testimony, he pretty
10    much did almost exactly what you have here,
11    okay, what the descriptive is in terms of
12    what he's supposed to do as a CMV driver in
13    opening up the barn door -- call it barn
14    doors -- cargo doors on a semitrailer.
15    So he had opened up the one on the
16    right first because you can't open up the
17    one on the left.  It's mechanically
18    impossible.  And then you open up the one
19    on --- there's a certain way to do it.
20    So this descriptive gives that
21    information, and then his testimony --
22    Mr. Ross' testimony reflects exactly that.
23    So in my mind, I'm looking at that and

Page 70

1    saying, you know what, it sounds to me --
2    and I have a right to be able to consider
3    that -- it sounds to me as if he were
4    effectively trained in that.
5    And you also look at -- once again, you
6    look at driver fitness under SMS or -- for
7    the motor carrier.  It's -- it's
8    considerably low.  I mean, they were
9    .6 percent national average out of vehicle out
10    of service.  That's -- that's -- quite
11    frankly, it's amazing.
12    Excuse me.  Driver out of service.
13    Driver out of service rate was .6
14    compared to a national average of 6.0.
15    I mean, so that tells me that they take a
16    concerted effort in making sure that their
17    drivers are effectively and properly
18    trained.  Because you don't get those
19    scores by not training.  That I can assure
20    you.
21    Q.  Have you seen any evidence of Heartland
22    training Mr. Ross on how to open
23    tractor-trailer doors?

Page 71

1    A.  I don't quite frankly recall any specifics
2    on it at the moment in time.  I mean, I
3    certainly -- I just don't recall
4    specifically on that.
5    Q.  Okay.  Would it be your opinion that it
6    would be Heartland's responsibility as
7    Mr. Ross' employer and also as a motor
8    carrier to make sure that Mr. Ross was
9    trained on how to safely open those trailer
10    doors?
11    A.  Sure.  And, again, if you look at the --
12    their safety record, it's highly suggestive
13    to me that they do take a lot of pride in
14    making sure that their drivers are
15    adequately and effectively trained.
16    Because they have to comply with 390.3,
17    paragraph (e)(1) and (e)(2), of the Federal
18    Motor Carrier Safety Regulations in making
19    sure that their drivers are effectively
20    trained for operating commercial motor
21    vehicles in interstate commerce.
22    Q.  Does it matter to you, Mr. Turner, that
23    Heartland does not have a policy to use

Page 72

1    load straps?
2    A.  I'm sorry?
3    Q.  Does it matter to your opinions at all that
4    Heartland does not have a policy to use
5    load straps?
6    MS. DYE:  Object to the form.
7    A.  Use load straps?
8    Q.  Yes, sir.
9    A.  Would it matter to me?
10    In this case here, not really, because
11    the assumption of -- the assumption -- I
12    shouldn't use the word assumption -- the
13    expectation -- the reasonable expectation
14    of Mr. Ross was that they applied the
15    straps.
16    He was getting out to give them the
17    straps to be able to apply them.  They
18    said, no, go get back in your truck.  So he
19    had the reasonable expectation.
20    So whether they trained him or not,
21    he -- it really doesn't matter because he
22    never had opportunity to be able to apply
23    that training by installing straps, straps

Video Deposition of Scott Turner

Page 73

1    meaning for the articles of cargo.

2    Q.  The last question did not relate to

3    training.  The last question was whether it

4    would matter to your opinions that

5    Heartland does not have a policy to use

6    load straps.

7          MS. DYE:  Same objection.

8    A.  Right.  And I did address that.

9    I addressed it in looking at training and

10   policy.

11        So if they have no specific policy --

12   because understanding is that -- they're a

13   common carrier.  Common carriers today

14   carry widgets, tomorrow insulation, the

15   next day refrigerator doors.  You cannot

16   train on every single thing.  You can train

17   on flatbeds.  You can train on

18   semitrailers.  But you talk about applying

19   load bars.  You talk about applying straps.

20   You talk about applying webbing and netting

21   and DID bags and all of these other things.

22        So in terms of policy, to come up with

23   a policy for every article of cargo that a

Page 74

1    common carrier may transport is almost

2    impossible, if not impossible.  It would be

3    volumes and volumes and volumes of books.

4    So do I think that that's reasonable, no.

5          In general, to talk about securing

6    articles of cargo -- clearly, you know,

7    he -- Mr. Ross knew that the articles of

8    cargo had to be secured because what he was

9    doing was walking down the side of his

10   trailer and sits there and goes, hey,

11   here's my straps, use those.  And then the

12   motor carrier turns around and -- excuse

13   me -- the loader sits there and goes, no,

14   don't need them, go ahead, go back to your

15   sleep, we have straps of our own.  That's a

16   reasonable assumption that they used the

17   straps.

18   Q.  You believe Mr. Ross' testimony indicates

19   he was next to the trailer when that

20   discussion occurred?

21   A.  If we're going to get like that -- all

22   right.  I'm assuming he was somewhere

23   around his trailer.  I mean, if you want

Page 75

1    to --

2    Q.  I'm just asking for clarification based on

3    what you just said of walking down the side

4    of the trailer.  If that was not intended

5    to actually be part of what you believe

6    happened, that's fine.  I'm just asking for

7    that clarified.

8    A.  Okay.  If he didn't walk down the side of

9    his trailer somewhere at Knauf, he

10   encountered the loader and offered his

11   straps and he was -- he said, no, don't

12   need them, have my own.

13   Q.  All right.  Mr. Ross has a commercial

14   driver's license; correct?

15   A.  CDL-A, correct.

16   Q.  Okay.  And what does a CDL-A designate?

17   A.  It designates him to be able to operate a

18   commercial motor vehicle that's over

19   26,001 pounds with a 10,000-pound coupled

20   semitrailer or trailer, so any combination

21   thereof.  And it's an articulated number,

22   so meaning coupled is you have a fifth

23   wheel with a kingpin.  You marry the two of

Page 76

1    them together and you drive down the road.

2          So that's a Class A CDL, as opposed to

3    a Class B, which is 26,000 pounds without a

4    coupled 10,000-pound trailer.

5          (Brief interruption by the court

6          reporter.)

7    Q.  Okay.  And Mr. Ross attended commercial

8    driving school as well; correct?

9    A.  I can't say that one way or the other.  I

10   mean, I believe he did.  I believe he did

11   when he -- and got his -- when he got his

12   CDL, but I'm not a hundred-percent certain

13   if he was grandfathered in.  But I do know

14   that the motor carrier does provide

15   additional training as well, and it's just

16   evidenced by their incredible safety record

17   of drivers out-of-service rate.

18   Q.  Okay.  And Mr. Ross has approximately

19   20 years' experience of driving

20   tractor-trailer trucks?

21   A.  Yeah, something like that, if I recall

22   correctly.  And that's what I'm saying is

23   that I don't know if he was in the under the

Page 77

1    wire of the CDL requirements and he was
2    grandfathered in or whatever the case may
3    be.  That's why I've kind of refrained from
4    saying that he went to CDL school, as I
5    think you referred or something like that.
6  Q.  Okay.  But certainly Mr. Ross is not a new
7    commercial driver.  He's got experience;
8    correct?
9  A.  Correct.
10 Q.  Okay.  Does Mr. Ross as a commercial driver
11    have any obligation to refresh or maintain
12    his knowledge as to how to safely operate
13    his motor vehicle?
14 A.  He does.
15 Q.  Okay.  And would that include an obligation
16    to remain current and fresh as to safety of
17    opening the back of the trailer?
18 A.  You know, that's a very light subject in
19    the FMCSRs.  So even though commercial
20    motor vehicles are still regulated by the
21    regulation -- by FMCSRs on private
22    property, so loading docks, et cetera,
23    it's -- it's not a -- it's not -- there's

Page 78

1    not -- there's nothing in the regulations
2    that speaks to exactly how a driver is to
3    open a semitrailer barn door.
4  Q.  Outside of the Federal Motor Carrier Safety
5    Regulation, is there anything that provides
6    bases that a driver should know as to how
7    to safely open the door?
8  A.  That's a matter of training.  That's a
9    matter of training.  And that's why you can
10    see this policy -- this policy pretty much
11    exemplifies exactly how you would open a
12    trailer door.  Then you read Mr. Ross'
13    testimony, and it pretty much reflects
14    exactly what the policy is.
15    So going back, I had mentioned to
16    you -- because you asked about training --
17    I had mentioned to you earlier about 390.3
18    and paragraph (e)(2).
19    I just pulled my reg up, and I'll read
20    it into the record real quick because
21    that's about the knowledge and compliance
22    with the regulations.
23    It says, (E), knowledge and compliance

Page 79

1    with the regulations:  Number 1, every
2    employer shall be knowledgeable and comply
3    with all the regulations contained in this
4    subchapter which are applicable to that
5    motor carrier's operation.
6    And then (e)(2) -- and that's (e)(1).
7    (E)(2), every driver and employee shall
8    be instructed regarding and shall comply
9    with all applicable regulations contained
10    in this subchapter.
11    I'm reading Mr. Ross' testimony, and
12    I'm saying to myself this guy has got a
13    good record.  There's no indication to me
14    whatsoever that he was not effectively
15    trained in order to be able to operate a
16    commercial motor vehicle safely and
17    effectively, in addition to making sure
18    that he secured his articles of cargo
19    effectively if he were in charge of doing
20    that.
21    Number 3 is that he knew how to open up
22    the barn doors on the back of a
23    semitrailer.  You open the right door first

Page 80

1    because you have no choice because
2    mechanically there is no choice.  You open
3    up the right barn door first, and you do
4    that specifically and methodically.  And
5    then you go to the left-side door, which
6    is the driver's side, and you do that
7    specifically and methodically.
8    But nobody in that specific and
9    methodic process anticipates a gust of wind
10    coming and blowing that door and causing
11    what happened here with the articles of
12    cargo to topple down on him nonprotected by
13    the door.
14 Q.  Okay.  Do you identify within your report
15    what you believe to be the best practices
16    for opening a tractor-trailer door or barn
17    doors as you're calling them?
18 A.  Well, we're relying upon the -- on page 15
19    of the report -- of our report here where
20    it talks about never open both doors at
21    once.
22    Well, that's an impossibility anyway
23    unless you have both of them unlatched.

Page 81

1    So we're -- there's no reason for us to
2    write up some specific process or protocol
3    or policy or, you know, things of that
4    nature. We're going to rely upon the motor
5    carrier's policy. That just makes sense.
6 Q. But does it make sense, say, if that policy
7    had not been communicated to Mr. Ross?
8 A. Again, whether it was verbally or written
9    or however, he did almost exactly --
10    exactly what was required there. So if he
11    didn't receive a policy, he certainly
12    received some type of training at some
13    point because he reflected almost exactly
14    how to do it with exception to the wind
15    gust that blew the driver's side door
16    open -- or blew it into him.
17    So he reflected almost exactly what
18    this policy says. If you look at never
19    open both doors at once, we know that.
20    And it says on the fifth bullet down on
21    page 15 -- it says stand directly in front
22    of the right door using your left hand to
23    release the latch while holding the door

Page 82

1    with your right hand. He said he did that.
2    If there is stock -- if there's stock
3    against the door and the door would push
4    you out and this way -- he checked if there
5    was any stock that was bulging against the
6    doors, and there was -- there was none.
7    And the right-hand side, by the way,
8    the curbside, never cascaded out. It was
9    the driver's side that cascaded out.
10    And then the last bullet point, it says
11    once the door -- once the first door is
12    fully opened and latched correctly, open
13    the left door using your right hand --
14    And he even specified and specifically
15    said he used his right hand, he said,
16    because I'm right-handed.
17    -- door handle to your left hand on the
18    door.
19    He did -- he did almost exactly what he
20    was told to do.
21 Q. Did Mr. Ross have his left hand on the door
22    while opening the left side of the trailer?
23 A. And the right. He used the right hand, if

Page 83

1    I remember correctly, to open the latch,
2    and then he used the left hand to begin to
3    open the door.
4    Now, I know that your -- your expert --
5    he was critical of the term "parallel."
6    Well, I'm not a human factors expert like
7    he is, so I can't sit here and tell you
8    exactly where -- you know, where Mr. Ross
9    was when that happened. But it appears
10    very strongly to us that he took care, made
11    sure that he was protecting himself by the
12    door, but the wind caught the door, an
13    unexpected event.
14 Q. If Mr. Ross were in fact not standing
15    behind the door with his left hand on the
16    door while opening the left side, would you
17    believe that to satisfy the best practices?
18 A. One more time. I'm trying to configure
19    this while you're saying it.
20 Q. Absolutely.
21    If Mr. Ross were not standing behind
22    the door while opening the left side with
23    his left hand on the door, would you

Page 84

1    consider that to satisfy the best
2    practices?
3 A. I'll -- again, I'll allow this document to
4    speak for itself in terms of best practices
5    because I agree with this document in terms
6    of best practices on -- where it says once
7    the first door is fully opened and latched
8    correctly, open the left door using your
9    right hand on the door latch handle and
10    left on the door.
11    He did this. So I'm relying upon this
12    policy here that was forwarded to Knauf.
13    And I agree with this. I agree with this
14    policy. I can't decipher that out any more
15    than that.
16 Q. When you are walking -- strike that.
17    When the driver is walking the left
18    door, okay --
19 A. When he's walking?
20 Q. When he's walking with the left door; okay?
21    You're opening the left door. Is he
22    walking backward or forward?
23 A. We're referring to -- we are referring to

Page 85

1    the driver's side door; correct?  Because
2    it's curbside and driver's side which
3    sometimes can confuse left and right.
4  Q.  Yes.  We can use the driver's side door.
5        When the driver is opening the driver's
6    side door of a trailer and they are walking
7    with the door, are they walking backwards
8    or are they walking forward?
9        MS. DYE:  Object to the form.
10 A.  You would want to -- alls I could tell you
11   is that you want to protect yourself with
12   that door.  And that was being done --
13   according to Mr. Ross, that was being done
14   until the wind caught the door.  All bets
15   are off at that point.
16 Q.  All right.  And when you say the driver
17   would be using whatever means to protect
18   themselves with the door, you mean to have
19   the door in between them and the cargo?
20 A.  If the door gets blown away from him --
21   blown into him, blown away from him,
22   whatever the case may be, it just -- it
23   changes all the dynamics.  So policy is --

Page 86

1    it becomes a totally different issue.
2  Q.  Okay.
3  A.  But there's no policy written in here that
4    says in the event that the door is blown,
5    make sure that you, you know, dive
6    behind -- it's just nonsensical.
7  Q.  I'm not asking about with a situation of
8    wind.  When a driver is opening the
9    driver's side door to a tractor-trailer,
10   are they supposed to keep the door between
11   themselves and the load?
12 A.  They're supposed to, but when you have a
13   door get blown open, like I said, where do
14   you go at that point?  What are you
15   supposed to do?
16       A door gets blown open, blown closed.
17   It changes all the dynamics.  Are you
18   supposed to drive behind the ICC bar?
19       No.  It's nonsensical.  It's just --
20   you can't sit here and say what are you --
21   what was he supposed to do when the door
22   got blown -- blown by heavy wind.  There's
23   nothing out there that talks -- that speaks

Page 87

1    to that issue in the regulations or
2    standards of care or best practices for
3    that matter.
4  Q.  I'd like to take you to page 19 of your
5    report, please.
6  A.  Sure.  Can we take a quick five, please?
7  Q.  Sure.  Absolutely.  We can go off the
8    record.
9  A.  Thank you.
10       THE VIDEOGRAPHER:  We are off the
11       record.  The time is 2:38 p.m.
12       (A recess was taken.)
13       THE VIDEOGRAPHER:  We are back on
14       the record.  The time is
15       2:46 p.m.
16 Q.  (By Ms. Baugh:)  Okay, Mr. Turner.  Right
17   before we went to the break we were
18   starting to direct our attention to page 19
19   of your June report.  So I will reshare my
20   screen so we are looking at the same thing.
21 A.  Yes, ma'am.
22 Q.  All right.  Now, Mr. Turner, the second to
23   the last paragraph there, it starts with it

Page 88

1    is clear from Ross' statements.  Would you
2    like a moment to read that sentence before
3    I ask you any questions?
4  A.  Yes.  Let me read it, please.
5        Yeah.  We can make -- it's supposed to
6    be CMV as opposed to CV, but go ahead.
7  Q.  That's fine.
8        If Mr. Ross when opening the back of
9    the trailer doors had noticed any cargo
10   shift, would that have changed how he
11   should have opened the trailer doors?
12 A.  Not -- well, I mean, it's hard to make a
13   determination of cargo shift if you didn't
14   see it before it was closed and sealed.  So
15   you really don't know if it was in effect a
16   true cargo shift because you don't know
17   what it looked like -- you know, he's
18   looking at that from the ground, and they
19   could have been 8-foot-long bales of
20   insulation for all he knew.  You know, they
21   didn't have any specific knowledge as to
22   the condition when he left.
23       So to be able to make a

Page 89

1    determination -- now, what he's referring
2    to later is that he says that the -- the
3    articles of cargo, the insulation, the
4    right-hand side, it looked like it was a
5    little bit disheveled -- not disheveled --
6    but a little bit out of skew, and then the
7    left-hand side appeared to be the same when
8    he started to open that door and remained
9    standing. It wasn't pressing up against
10   the door, he said as well.
11   Q.  If a driver opening the back of the
12   tractor-trailer upon looking in believes
13   that the load has shifted, does it change
14   how the driver should open the back of the
15   door?
16   A.  No. If he sees that the articles of cargo
17   are -- again, he cannot make an absolute
18   determination as to whether there was any
19   effective shifting of the cargo -- the
20   articles of cargo. So if he looks at it
21   and he determines that there is some type
22   of disheveled appearance to the articles of
23   cargo, then at that point there should

Page 90

1    close the doors back up again. But he said
2    that there was nothing that was indicating
3    to him that the articles of cargo were in
4    any kind of state of disarray.
5    Q.  Okay. You just stated that if -- upon
6    opening on the right side, it sounds like
7    if he believed that there was a shift in
8    the cargo, he should close the right door
9    again. Is that -- did I understand that
10   part correctly?
11   A.  So let me clarify.
12       So if he opens up the right door,
13   nothing comes out, he can make an
14   observation that it seems to be safe or
15   maybe a little bit of cargo -- articles of
16   cargo movement. Then he looks to the
17   left-hand side and let's just say
18   hypothetically he noticed that the bales --
19   the bales of insulation were pressed up
20   against that door and then he went and
21   opened it anyway. Problematic, sure. Of
22   course it is. But that was not the case
23   because he had already started getting the

Page 91

1    door open.
2    Q.  Okay.
3    A.  Excuse me one second.
4        THE VIDEOGRAPHER:  Do y'all want
5        to go off the record real
6        quick?
7        THE WITNESS:  No, no. I'm back.
8        I'm sorry. The advantage of
9        deposing out of a hotel room
10       with two dogs.
11   Q.  So for this question I'm not asking about
12   Mr. Ross specifically. I'm trying to
13   understand how a driver is supposed to open
14   the back of a trailer door.
15       So I believe you had indicated if the
16   driver opens the door and believes that
17   there is either shifting or the load is
18   pressing against the door, they should not
19   open the door; correct?
20   A.  If -- let me clarify.
21       If he opened up the right door and all
22   the cargo was intact, he noticed it was
23   intact, he was able to open it all the way

Page 92

1    up and chain it back to the side wall, then
2    he looked inside and he saw that there was
3    no articles of cargo pressed up against the
4    door -- the barn door, then he can go ahead
5    and open that door up.
6        If he noticed that there's cargo all
7    over the place in there, then, of course,
8    he wouldn't -- he wouldn't open it up. And
9    if it was pressing up against the door, he
10   wouldn't open up that door either.
11       But he stated in testimony -- and,
12   again, I have no reason to believe
13   otherwise other than -- you know, that he's
14   given sworn testimony -- that the articles
15   of cargo were -- they were -- they
16   appeared -- I think he used the word
17   "appeared" -- appeared to be in the same
18   manner that the right-hand side was.
19   Q.  At the bottom of page 19, the last
20   paragraph, if you'll go ahead and read that
21   and then let me know when you're ready for
22   the question.
23   A.  Okay.

Page 93

1  Q.  Okay.  The second sentence in that last
2  paragraph at the bottom of page 19 of your
3  report states:  It is not a policy of
4  Heartland nor is this action regulatory in
5  terms of FMCSR.
6      Are you simply stating that the Federal
7  Motor Carrier Safety Regulation does not
8  dictate a certain method for opening the
9  trailer doors?
10  A.  Okay.  You jumped in the middle of this
11  paragraph again.  That throws me off
12  whenever you do that, so if you'll read the
13  entirety of the paragraph.
14      It should be noted that Heartland's
15  guideline as listed above is just that.  It
16  is [sic] a policy of Heartland nor is this
17  action regulatory in terms of the FMCSR.
18      Now, what's the question on that?
19  Q.  When you say that nor is this action
20  regulatory in terms of FMCSR, I just want
21  to make sure I understand what you're
22  saying.  You're simply saying best
23  practices as to opening the trailer door

Page 94

1  does not necessarily come from the Federal
2  Motor Carrier Safety Regulation?
3  A.  Correct.
4  Q.  Thank you.
5  A.  I mean, there's publications out there
6  about that, but it's not a matter of --
7  it's not codified into law.
8  Q.  All right.  The last sentence at the bottom
9  of page 19, you state:  Additionally, it is
10  most probable that Ross' method of opening
11  the CMV semitrailer doors on the Heartland
12  CMV was not causative to the subject
13  incident.
14      How did you go about analyzing
15  causation of the incident?
16  A.  Additionally, it is most probable that
17  Ross' method of opening the CMV semitrailer
18  doors on the Heartland CMV was not
19  causative to the subject incident.
20      So, in other words, there was nothing
21  indicated to us in his deposition that
22  something that he did -- so, in other
23  words, when he opened that left-hand side

Page 95

1  door, the driver's side door, that he
2  noticed that there was articles of cargo
3  pressed up against the door but opened it
4  anyway.  That wasn't the case.
5  Q.  Okay.  Going on to the next page, so the
6  top of page 20.  Do you want to read the
7  rest of what you had relating to this
8  opinion?
9  A.  Yes.  Just the top paragraph or both?
10  Q.  Both.  Since they relate to the same
11  opinion, both, please.
12  A.  Okay.
13  Q.  All right.  The first paragraph at the top
14  of page 20 references Knauf performing a
15  basic and rudimentary procedure.  What is
16  the basis for determining that it is a
17  basic and rudimentary procedure?
18  A.  Opening a door is basic.  I mean, it's
19  basic.  You know, it's not some complex
20  pulling a transmission from a commercial
21  motor vehicle.  It's not, you know, dealing
22  with extremely high hazardous-type
23  materials for securement purposes.  This is

Page 96

1  just opening up a trailer door.  So I think
2  it's pretty -- it's a pretty basic and
3  rudimentary procedure.
4  Q.  Okay.  But I believe in this sentence you
5  are referring to what Knauf would have
6  done.
7  A.  Yeah.  Yeah.
8  Q.  Okay.  That second paragraph at the top of
9  page 20, you say that this would also be
10  relevant as to opinion 3 of Pinckney where
11  he indicates Ross would have observed the
12  lack of securement when looking behind the
13  closed CMV semitrailer doors to confirm the
14  articles of cargo had not shifted.
15      Do you see that?
16  A.  Yes.
17  Q.  Are you stating that Mr. Ross would not
18  have indicated the lack of -- strike that.
19      Are you trying to indicate Mr. Ross
20  would not have noticed the lack of straps?
21  A.  No.  I'm stating what your expert,
22  Pinckney, stated.
23      So it says:  This response is also

Page 97

1    relevant to opinion number 3 of Pinckney
2    where he indicates Ross would have observed
3    the lack of securement when looking behind
4    the closed CMV trailer doors to confirm the
5    articles of cargo had not shifted.
6        That's -- I'm just reciting what your
7    expert is claiming.
8    Q.  Okay.  Do you agree that with the right
9    side of the trailer open, Mr. Ross would
10   have been able to observe whether or not
11   load straps were in use?
12   A.  Sure.  Went over that before.
13   Q.  Okay.  On page 20, you include some
14   quotations from the testimonies of
15   Mr. McGrew and Todd, and then on page 21
16   you continue with some testimony from
17   Mr. Bjerke.  Is that correct?
18   A.  Yeah.  I've been trying to pronounce that
19   name correctly, but I just kind of drop the
20   "J."
21       Yes.  All three of them, they -- pretty
22   much their testimony was all consistent
23   that Knauf knew about -- they had

Page 98

1    conversations about this multiple times in
2    memo form and so forth, but it just never
3    rectified.
4        So that's what I talk about -- and this
5    is actually one of my opinions that I'm
6    going to add on when we get to the end --
7    and we can even talk about that right now
8    because it's based on this -- that based on
9    these three -- I think it was something
10   like 24 different complaints -- comments or
11   complaints regarding this very situation
12   with articles of cargo cascading from
13   trailers.  That is a matter of Knauf having
14   been put on notice by -- by outside
15   parties, outside vendors or third-party
16   administrators or whatever you want to call
17   them, that this was a problem.  It was a
18   problematic issue.
19   Q.  Did you take into consideration the
20   testimony of Mr. McGrew and Todd that they
21   had not themselves had any discussion with
22   Knauf as to any incidences of falling
23   freight?

Page 99

1    A.  Yes.  But I'm talking about that they --
2    they testified here:  So we had requested
3    that corporate reach out to them and
4    request that.
5        So that's what he's talking about,
6    Knauf or Knauf.  I'm not sure how to
7    pronounce that.
8    Q.  Okay.  And both Mr. McGrew and Mr. Todd
9    also testified they did not know whether or
10   not Cameron Ashley's corporate actually had
11   done that; correct?
12   A.  I don't specifically -- it's a memory test.
13   I mean, I don't specifically recall that
14   exact line.
15   Q.  Okay.  If that is their testimony, would
16   that impact whether or not you believe
17   Knauf had been put on notice?
18   A.  I would have to see the specific testimony
19   before I --
20   Q.  Okay.  So it may --
21   A.  I'll allow the testimony to speak for
22   itself.  I mean, I'm not going to -- just
23   like I didn't with Mr. -- with Mr. Ross, I

Page 100

1    don't -- I don't -- I'm not going to
2    challenge his testimony.  It's not my job.
3    So if they state that, you know, then they
4    state it.  The document says what it says.
5    Q.  Okay.  At the bottom of page 21, why don't
6    you read -- you do not -- I'm not going to
7    ask about the quotation of testimony.  Just
8    your opinion.  So if you will read that
9    part and let me know when you're ready.
10   A.  You're saying at the bottom of page 21, the
11   last paragraph?
12   Q.  Yes, sir.
13   A.  Okay.
14       I forgot to put "modus" in there, modus
15   operandi.
16       So it now reads:  As aforestated, Knauf
17   took the lackadaisical approach to
18   responding to customer service comments
19   regarding load securement, obviously a
20   modus operandi of profit over safety.  In
21   his sworn deposition testimony, Weldon
22   states that unless the customer service
23   response specifically requests Knauf use

Page 101

1  cargo securement devices, Weldon considers
2  the customer comments as unjustified.
3      And then it goes into testimony.
4  Q. What evidence are you relying on as to
5  Knauf's profit?
6  A. Well, if you are not -- if you have
7  hypothetically --
8      And I'm just going to use -- I'm going
9  to throw just a random number out there.
10  -- ten trailers leaving your terminal,
11  your facility, whatever it may be, your
12  manufacturing facility, shipping
13  operation -- if you've got ten trailers
14  leaving your facility every day and there's
15  a cost factor to the straps of $20 per
16  strap hypothetically, that's $200 a day.
17  That's a thousand dollars a week that --
18  it's a motor -- excuse me -- shippers are
19  saying we're not going to use them. And it
20  in all likelihood, in all probability, is a
21  profit-over-safety modus operandi.
22  Q. All right. You have not reviewed any
23  documents from Knauf relating to their

Page 102

1  profit or their costs specifically, though;
2  correct?
3  A. No, of course not. But I'm basing it on
4  what I know that straps would cost.
5      You know, they're north of 20. I'm
6  just using a round figure. They're north
7  of 20. So building that cost into the cost
8  of a cargo load, that's reasonable. But
9  I'm just basing it on the fact that if you
10  hypothetically -- and, again,
11  hypothetical -- had ten trailers a day
12  leave your facility and you had to put $20
13  worth of straps at $200 a day -- times five
14  is a thousand dollars, times four is $4,000
15  a month.
16      So I'm just saying that as a basis of
17  understanding why -- why a shipper perhaps
18  may option to not operate in a safe manner
19  by making sure that their -- when they were
20  put on notice by McGrew, Todd, and Bjerke
21  that they didn't react according.
22  Q. Okay. Do you provide anywhere in your
23  report the cost of a load strap?

Page 103

1  A. No. No. But I'll make sure that I have
2  that for trial, but I'm just saying for
3  deposition purposes -- you know, when it
4  comes time for trial, I'll have an exact
5  receipt because I'll go out and buy two
6  straps.
7  Q. Mr. Turner, if I could have you look at
8  page 22 of your report.
9  A. Sure.
10  Q. And specifically I am drawing your
11  attention to the paragraph roughly in the
12  middle of the page that starts with it
13  would be a sensical conclusion.
14  A. Yes. Let me read that first, please.
15      I'm going to read a little bit above
16  that, too, because it's referencing above.
17      Okay.
18  Q. Okay. The last sentence in that paragraph,
19  you state that Knauf's failure to utilize
20  load-securement devices offered by Ross is
21  a proximate cause to the subject incident.
22  A. Yes.
23  Q. Have you set forth a causation analysis in

Page 104

1  your report?
2  A. No. We're not accident reconstructionists.
3  Q. Okay.
4  A. And that's based on testimony -- that
5  opinion there or that paragraph is based on
6  the testimony where above that he -- he
7  testified, Mr. Ross -- is that and I had
8  two load straps with me and I presented
9  them to him and he told me that they
10  already had some, that he didn't need them.
11      THE WITNESS: I'm trying, Madam
12      Court Reporter. I'm doing my
13      best.
14  Q. Okay. The paragraph right above where it
15  says opinion number 4, so a little bit
16  lower, still on page 22 of your report, the
17  one that starts with it is the opinion of
18  the undersigned. Do you see that?
19  A. Yes.
20  Q. All right. If you'll read that sentence
21  and then let me know when you're ready for
22  the question.
23  A. Okay.

Page 105

1  Q.  Okay.  You identify an industry standard
2     for customer service.  What industry
3     standard for customer service are you
4     relying upon?
5  A.  It is the opinion of the undersigned that
6     the industry standard for customer service
7     would be a safe work environment free from
8     falling articles of cargo and -- so what we
9     do is because 393.100 would not be
10    applicable to Knauf -- because in this case
11    here they are not a motor carrier.  I don't
12    know if they have a motor carriage
13    operation, but in terms of this case here,
14    they are not a motor carrier, so I cannot
15    reasonably apply the regulations of the
16    FMCSR to a shipper.
17       However, I can take that and say
18    393.100 is a matter of regulation that can
19    be used as a standard of care or even at
20    best practice to make sure that the
21    articles of cargo are adequately secured.
22 Q.  Okay.  I'd like you to drop down to the
23    bottom of page 22 where you begin to

Page 106

1     talk -- respond to opinion 4 of
2     Mr. Pinckney.
3  A.  Where it starts out it is most probable?
4  Q.  No.  The paragraph before that.  The first
5     one under opinion 4.
6  A.  Okay.
7  Q.  The one that starts with while the
8     undersigned agrees.
9  A.  I gotcha.  Okay.  I'll read that real
10    quick.
11       Okay.
12 Q.  Okay.  The first sentence in that paragraph
13    immediately under opinion number 4 on
14    page 22 states that while the undersigned
15    agrees that there is no absolutes when it
16    comes to securing articles of cargo, there
17    is unsurmountable evidence that the proper
18    application of load-securement devices
19    extremely minimizes the risks of articles
20    of cargo shifting and/or falling from the
21    CMV.
22       Within that sentence, what
23    insurmountable evidence are you

Page 107

1     referencing?
2  A.  That the articles -- there would be no
3     regulation -- let me put it this way:  If
4     articles of cargo never cascaded, they
5     never fell off -- they never -- any of
6     those things -- they just remained on a
7     trailer.  Everything you put on the back of
8     a trailer just remained on the trailer.
9     Then there's no reason for 392.9.  There's
10    no reason for 393.100.  There's no
11    necessity for essentially the FMCSR in
12    terms of securement of articles of cargo.
13       So that right there and to me in and of
14    itself is just -- there would be no need
15    for it.  But due to the fact that we know
16    that articles of cargo will dislodge, will
17    shift due to relative motion of commercial
18    motor vehicles, the regulations do exist.
19       So when it says while the undersigned
20    agrees that there are no absolutes when it
21    comes to securing articles of cargo, there
22    is insurmountable evidence that the proper
23    application of load-securement devices

Page 108

1     extremely minimizes risks of articles of
2     cargo shifting or falling from the CMV.  I
3     mean, there would be no regulations if it
4     was not an issue, but there are regulations
5     because it is recognized by the FMCSA as --
6     and the FMCSRs as a problem.
7  Q.  The next sentence, looking at that same
8     paragraph --
9  A.  Yeah.
10 Q.  -- reads:  The risk comparison between no
11    load securement and adequate load
12    securement easily shows the higher risk of
13    pernicious incident such as the subject
14    incident when there is no load securement
15    in place of the CMV.
16       Okay.  Did you do a risk comparison
17    yourself?
18 A.  No.  Based on -- not on this particular
19    case.  But it is demonstrated and proven
20    that load securement fail -- load
21    securement -- failure to load secure is a
22    leading cause -- one of the leading causes
23    of commercial motor vehicle crashes.

Page 109

```
1        For example, if you take an 18-wheeler
2   CMV -- in this case here that's what we
3   have, a five-axle -- and the driver is
4   going around an interchange on an
5   interstate highway and the articles of
6   cargo in the back of the semitrailer are
7   not adequately secured, you get a shift.
8   And if the driver is making a right radius
9   turn, you get that shift and the articles
10  of cargo shift and fall to the left side of
11  the semitrailer, it's over.
12       I've handled many, many, many, many
13  cases such as that.  So that's based on
14  experience as well as based on the
15  regulations -- or excuse me -- the FMCSA
16  making such statement in terms of that.
17 Q.  So you're not referencing to, for instance,
18  a published study or a specific risk
19  comparison when you're making this
20  statement?
21 A.  No.  Again, the FMCSA, which is the
22  administration whom writes/authors the
23  FMCSR with input from the industry, has a
```

Page 110

```
1   document that talks about -- it talks about
2   that very issue, that load securements --
3   and it's actually somewhere in the report.
4   I don't remember exactly where.
5        But it's somewhere in the report we
6   talk about that specific issue of the
7   Federal Motor Carrier Safety -- or excuse
8   me -- the Federal Motor Carrier Safety
9   Administration addresses that as a -- one
10  of the leading causes of crashes is
11  unsecured articles of cargo because -- and
12  that includes flatbeds.
13       I mean, if you take TMC, for example,
14  which is a major flatbed carrier, and if
15  they don't -- if they don't secure a
16  flatbed and something comes off on a
17  highway and bounces down a roadway and goes
18  through the windshield of a car, that's the
19  type of incidents that they're speaking of.
20  So they're saying that they do cause
21  pernicious crashes.
22       Almost every rollover that you see that
23  occurs on an interchange off an interstate
```

Page 111

```
1   highway is often either from operating too
2   fast for conditions or it's because of
3   articles of cargo shifting in a semitrailer
4   during -- during that radius maneuver.
5 Q.  Okay.  Are you aware of what statistical
6   analysis method was used for this risk
7   comparison that you're referencing?
8 A.  You would have to talk to the FMCSR about
9   that because I don't know what the metrics
10  were.  I'm assuming that it's based on
11  studies from -- I believe the third edition
12  of the Large Truck Crash Causation Study
13  addresses that as well.
14       But in specifics are -- did we break it
15  down and talk about, you know, this
16  percentage is caused by this and has been
17  determined by that, no.  We just don't --
18  we just don't -- there's no need to in this
19  case here because, quite frankly, it's --
20  it's an issue of the driver offering his
21  straps and being rejected and said I have
22  my own -- we have our own straps, we don't
23  need yours, go to bed.
```

Page 112

```
1 Q.  Do you know which specific load-securement
2   device is being utilized in this risk
3   comparison that is referenced on the bottom
4   of page 22?
5 A.  It could be any number.  It says -- where
6   it says here it's most probable that had
7   Knauf performed the basic rudimentary duty
8   of wrapping the bundles of insulation and
9   placing adequate securement devices at the
10  rear of the semitruck -- now, that term
11  "devices" is very broad, because it could
12  be D-I-D bags, which are called DID bigs.
13  It could be blocking and bracing by
14  timbers, in other words, two-by-fours and
15  so forth.  It could be straps.  It could be
16  K-rail webbing.  It could be -- I mean,
17  there's a whole plethora of -- load bars.
18  There's a whole plethora of various
19  methodologies of articles -- securing
20  articles of cargo.
21       And some of them are directly addressed
22  in 383.111 further into that subchapter --
23  or into that chapter where they talk about
```

Page 113

1  specifics, for example, you know, securing
2  logs on the back of a trailer.  And so they
3  talk about some specifics.
4        And, you know, I had a case years ago
5  in Alabama where there were logs on the
6  back of a trailer, and it was problematic.
7  And so, you know, they talk about all
8  different levels of load securement,
9  nothing specifically.  So it's just a
10 general statement.
11 Q.  Okay.  Are you rendering an opinion as to
12     which specific load-securement method
13     should have been utilized in this case?
14 A.  Well, load bars are -- load bars could have
15     been used, but -- they could have asked the
16     driver, you know, let us use your load
17     bars, but they didn't.  They could have
18     taken Mr. Ross' straps and used them, but
19     they didn't.  They could have applied some
20     timbers in the back, you know, but they
21     didn't.  There could have been any number.
22     They could have used DID bags, which you
23     put them inside and you blow them up with

Page 114

1  air and they put them up against the door
2  and they keep all the articles of cargo in
3  good shape during transit.
4        So they didn't do that.  They did
5  nothing.  They just basically closed the
6  door up and, you know, represented that
7  they had their straps, so they didn't need
8  the driver's.  And they closed the doors,
9  and that was it, move on.
10 Q.  Okay.  That was not responsive to my
11     question.
12       My question is, are you rendering an
13     opinion as to which load-securement method
14     should have been used in this case?
15 A.  Okay.  Like I said, is that they could
16     have -- yeah.  I thought I answered that in
17     the beginning.  I said they could have used
18     DID bags.  They could have used straps.
19     They could have used timbers.  They could
20     have used load bars.  They could have used
21     webbing.  They could have used K-rail
22     straps.  They could have used a whole
23     number of different things or a combination

Page 115

1  thereof, but they just chose to do nothing.
2  They just closed it up and said get on your
3  way.
4  Q.  Okay.  Understanding you have just listed
5     different methods that could have been
6     used, are you providing an opinion as to
7     which one should have been used?
8  A.  No.  I think they had straps -- you know,
9     I'll give you an extra five minutes after
10    five o'clock because I've got a dog that's
11    got to go out.  So if I can take five
12    minutes to take care of that real quick and
13    come right back, I'll give you an extra
14    five at the end.
15 Q.  We can absolutely take a five-minute break.
16    That's fine.
17 A.  Thank you.
18       THE VIDEOGRAPHER:  We are off the
19    record.  The time is 3:15 p.m.
20    (A recess was taken.)
21       THE VIDEOGRAPHER:  We are back on
22    the record.  The time is
23    3:20 p.m.

Page 116

1  Q.  (By Ms. Baugh:)  Okay, Mr. Turner.  I would
2     like to direct your attention to page 23 of
3     your report again.  That might have been
4     where we already were.
5  A.  Sure.
6  Q.  But specifically I would like to take you
7     on page 23.  It's within your opinion in
8     response to Mr. Pinckney's fifth opinion.
9     And I want to bring you down to this
10    paragraph here that starts with -- well,
11    really these last two paragraphs, the ones
12    that start with motor carrier industry best
13    practices and then the next one that says
14    in some cases.  So if you would read those
15    two and let me know when you're ready for
16    the questions.
17 A.  Sure.
18       Okay.
19 Q.  Okay.  I believe you've previously
20    testified that the shipper is not held or
21    subject to the Federal Motor Carrier Safety
22    Regulations.  Is that accurate?
23 A.  The shipper is not.  That's correct.

Video Deposition of Scott Turner

Page 117

1  Q.  All right.  But the motor carrier and the
2      driver is; correct?
3  **A.  The motor carrier and the driver, yes, and**
4      **a broker in many different cases; but motor**
5      **carrier and driver, correct.**
6  Q.  Okay.  So in this second paragraph that
7      I've directed you to here, the last
8      sentence of it states that, specifically,
9      while the motor carrier and professional
10     CMV driver are subject to the FMCSR, the
11     shipper shares the burden of adequate load
12     securement in a sealed CMV.
13         Do you see that sentence?
14 **A.  You jumped in the middle of a paragraph**
15     **again, I think.**
16 Q.  It is the last sentence of the two
17     paragraphs I asked you to look at.
18 **A.  Okay.  All right.  Let me find out where**
19     **you picked up from.**
20         Okay.  I see where you were.
21         Okay.
22 Q.  Okay.  What creates the basis for a shipper
23     sharing the burden of adequate load

Page 118

1      securement in a sealed CMV if it is not the
2      Federal Motor Carrier Safety Regulation?
3  **A.  It's the offer of straps and being**
4      **rejected.  So you offer a load-securement**
5      **device as a professional loader of articles**
6      **of cargo, and then you reject it and say we**
7      **have our own.  In my -- and the way that**
8      **I'm looking at this is that that right**
9      **there is -- the shipper assumed the duty at**
10     **that point.  And that's the best way to put**
11     **it.**
12         **Now, is there a specific regulation**
13     **that speaks to that and says that they**
14     **assumed it, no.  It's testimony of**
15     **Mr. Ross, his sworn testimony.**
16         **And then you look back on the history**
17     **of the amount of times that articles of**
18     **cargo have fallen off of Knauf loads is --**
19     **it just compounds -- again, it's taking all**
20     **of the universe of information in**
21     **discovery, throwing it into a pot, mixing**
22     **it up, and coming out with a report.**
23     **That's what we have here.  They accepted**

Page 119

1      the responsibility of securement of the
2      articles of cargo.
3          So is it a common-law issue?
4          Perhaps.  I don't know.  I'm not an
5      attorney.
6          But is it a regulatory matter?
7          Well, using best practices -- you can
8      go to J.J. Keller and look at that, and
9      they'll talk about best practices of
10     securing articles of cargo.  And if a
11     shipper assumes that responsibility --
12     assumes that responsibility by saying we
13     have our own straps, Mr. Ross, thank you
14     very much, take them back to your cab, go
15     to bed, we'll wake you up when we're done,
16     they assumed the responsibility.
17 Q.  When you reference J.J. Keller right now
18     for looking at best practices, what exactly
19     are you referencing there?
20 A.  Oh, I don't know.  I'm just going off the
21     top of my mind, seeing many of their
22     documents over the many years.
23 Q.  Okay.  When in your report on page 23 --

Page 120

1      when you say there that the shipper shares
2      the burden of the adequate load securement,
3      what -- how is that burden allocated
4      between the motor carrier driver and
5      shipper?
6  A.  Okay.  Where it says specifically -- let's
7      read the whole paragraph.
8          In some cases, such as when the CMV
9      semitrailer is sealed, shippers' actions
10     are specifically mentioned in the FMCSR and
11     their interpretations.  Specifically, while
12     the motor carrier and professional CMV
13     driver are subject to the FMCSR, the
14     shipper shares the burden of adequate load
15     securement in a sealed CMV.
16         I look -- and that's a general --
17     that's a general statement to pose
18     specifically to this case.  So a motor --
19     so, in other words, we're not specifically
20     referencing -- we're looking at 392.9, and
21     that's what we're addressing here.  We're
22     not specifically saying Knauf here.
23         What we're saying is that a shipper,

Page 121

1    when they assume the responsibility of
2    securing articles of cargo by being offered
3    straps and rejecting those straps and the
4    driver can't watch a live load, they're
5    assuming that responsibility. So the
6    statement of a shared responsibility is
7    going to depend upon the circumstances of
8    the issue.
9         Now, in this particular case here, I
10   look at it 100 percent on Knauf. And the
11   reason I look at it 100 percent on Knauf
12   and there's no responsibility, because
13   Mr. Ross made the effort of coming out of
14   his truck tractor and saying here's my
15   straps, and they say, no, thank you, we
16   have our own, we use our own, go away.
17   That's -- that's what that paragraph is
18   referring to.
19   Q.  Okay. So your opinion in this case is that
20   Knauf held all the responsibility and
21   Mr. Ross and Heartland had none?
22   A.  My opinion, yes, absolutely. Because
23   Mr. Knauf -- excuse me. Not Mr. Knauf.

Page 122

1    Mr. Ross got out of his commercial motor
2    vehicle at some point, maybe met the loader
3    on the side of the trailer or at the window
4    where they get their bill of lading,
5    whatever the case may have been. He was --
6    he offered his straps. He was rejected on
7    his straps. And when he was rejected on
8    his straps, he was told you can't watch
9    this load, go to bed -- go back to your
10   truck. That's what I mean by that. Go to
11   your sleeper, whatever.
12        So Mr. Ross made the effort, was
13   rejected on the effort. So he made the
14   reasonable assumption that the articles of
15   cargo were adequately secured in order for
16   him to be able to take that load of
17   articles of cargo out into commerce -- in
18   interstate commerce.
19   Q.  Is there a place in your report where you
20   state that Knauf holds all of the liability
21   for load securement and Heartland and
22   Mr. Ross hold none?
23   A.  No. I just said it now.

Page 123

1    Q.  Okay. Now I'd like to move to -- it goes
2    to the bottom of page 24 of your report and
3    continues onto page 25. It is -- in this
4    section you are -- section 7 of your
5    report, you are setting forth your opinions;
6    correct?
7    A.  Yes. They're what we call -- we call them
8    overarching opinions, but this -- all --
9    everything else written in this report
10   prior to this is also part of the opinions
11   as well. So it's not exclusively these
12   20-whatever opinions that we came -- that
13   we wrote up here, 20 opinions.
14   Q.  And -- I apologize.
15        And the factual bases and analysis for
16   these opinions that you list out starting
17   at the bottom of page 24 should be found in
18   your report. Is that correct?
19   A.  Yes. Well, it's found in the report, yes,
20   and -- you know, either directly or
21   indirectly, but it's all found in the
22   report.
23        For example, I'm adding on another

Page 124

1    opinion here, as I stated earlier, based on
2    the -- page 20 where Todd, McGrew, and
3    Bjerke -- they gave testimony that articles
4    of cargo -- it's a systemic problem.
5    They're constantly cascading out of the
6    semitrailers that are loaded by Knauf --
7    not constantly. I don't want to use -- not
8    constantly, but often. Alls it takes is
9    one time.
10        So when you look at that, that's an
11   additional opinion --
12        Now, I don't know where we would place
13   it in there, but somewhere in here and just
14   call it 21.
15        -- that Knauf was put on notice based
16   on the testimony of those three
17   individuals. They knew of it, but they
18   just simply refused to do anything about
19   it.
20   Q.  Okay. So opinion 2 that you have that
21   starts at the bottom of page 24 and
22   continues onto page 25, if you will,
23   please, read that and let me know when you

Page 125

1  are ready for the question.
2  A.  Opinion 2.  You don't want to discuss
3  opinion 1 and start at the top?  Because
4  that's a pretty important opinion.
5  Q.  My question is relating to opinion 2, yes.
6  A.  Fair enough.  Okay.
7      It is the undersigned's opinion that
8  Knauf performed the basic and rudimentary,
9  yet vitally important, safety function of
10  applying adequate means of securement, the
11  cargo straps Ross offered to the Knauf
12  employee at a minimum, for the articles of
13  cargo loaded upon Ross' Heartland CMV
14  semitrailer ensuring the articles of cargo
15  within Ross' CMV were secure from shifting
16  and/or falling from the CMV semitrailer the
17  subject incident would not have occurred.
18  Q.  Okay.  Is it your opinion that the use of a
19  load strap on the load that Mr. Ross
20  delivered to Cameron Ashley would have
21  prevented cargo -- any cargo from falling
22  out of the back of the truck?
23  A.  It's to a high degree of probability that

Page 126

1  that's the case.  Because other than that,
2  the FMCSR wouldn't even bother writing
3  393.100 or 392.7 of the regulations.  So,
4  yeah, I -- absolutely.
5  Q.  Well, my question -- and I just want to
6  make sure that what I was asking is what
7  you're answering.
8      My question, though, relates
9  specifically to the use of a cargo load
10  strap; okay?  So just strap.  Is this
11  opinion stating that if a cargo load strap
12  had been used on the load that Mr. Ross
13  delivered the freight would not have fallen
14  out of the back of the truck?
15  A.  And I said to a high degree of probability.
16  Q.  Okay.  Thank you.
17  A.  You're welcome.
18      There's no absolutes.  I mean,
19  there's -- you know, there's just no
20  absolutes.  But when cargo securement is
21  utilized on a commercial motor vehicle and
22  it's the appropriate type cargo securement,
23  it reduces the risk of cargo securement

Page 127

1  failures or what's referred to as relative
2  motion while transporting the articles of
3  cargo.
4      Excuse me.
5      There's a high degree of probability
6  that it does not occur.
7  Q.  Okay.  And in that you just referenced the
8  appropriate cargo securement.  And so in
9  this case for the cargo that we're talking
10  about here today with Mr. Ross, for you,
11  you believe a load strap would have been an
12  adequate or appropriate means of load
13  securement?
14  A.  I think it's a reasonable means, yes.  I
15  think it's a reasonable means by -- yeah,
16  absolutely.
17  Q.  Okay.  I'd like to go to --
18  A.  But, then again, what I want to also say is
19  that -- the appropriate type straps.
20      Now, I would well imagine based on the
21  motor carrier's history that they have
22  offered the appropriate type straps.
23      Whatever the loader alleges to have had and

Page 128

1  was going to apply, that's -- I don't know
2  what the -- because you can't have fraying
3  on the straps and things like that.  They
4  have to be well intact.
5  Q.  What about the straps that Mr. Ross says he
6  offered?  Have you --
7  A.  That's what I'm saying.  That's exactly
8  what I'm talking about.  They're a motor
9  carrier, and a motor carrier, especially a
10  motor carrier like this that has a
11  demonstration of a substantial safety
12  record, my mind would say that they -- they
13  had the proper straps.
14      I doubt that they just went to Home
15  Depot and picked up some little tiny
16  ratchets that just don't do any good at
17  all.  They probably had an effective
18  means -- see, it's called working load
19  limit, that the straps had to have some
20  degree of working load limit for that type
21  of -- that type of articles of cargo
22  shipment.
23  Q.  Do you know the working load limit of the

Page 129

1    straps that Mr. Ross says he offered to
2    Knauf?
3    A.  Never saw them.  Never examined them.  I'm
4        just -- I'm stating it based on the fact of
5        the motor carrier's record of safety.
6        Their record of safety was exceptional.
7            So I would doubt that they went out to,
8        you know, some ship -- some DIY place and
9        just bought a box of straps and just --
10       substandard and didn't spend $20 but just
11       spent $5 and said, here, throw those on
12       cargo.  No.  I find that hard to believe,
13       but I can't prove it one way or the other.
14       But, nonetheless, they weren't used anyway.
15       He was told to take them and put them back.
16       So it really is an irrelevant issue.
17   Q.  Well, but your opinion was that if they
18       used the load straps that Mr. Ross offered
19       the incident would not occur.
20   A.  I don't know what type straps they had, but
21       you're also talking about articles of cargo
22       that are not extremely heavy.
23           MS. DYE:  Object to the form.

Page 130

1    A.  So you're not talking about 55-gallon drums
2        filled with liquid that are 600 pounds
3        apiece.  We're talking -- or hazardous
4        material.  We're talking about essentially
5        big, giant, large pillows, bales, if you
6        will, of insulation.  So it's not extreme,
7        extreme weight.
8            So I believe that the straps that they
9        would have had on there, it would have --
10       do I -- do I have them in front of me to
11       look at them?  Did I ever have them in
12       front of me to look at?  Was there any
13       information specifically on them?
14           Not insofar as I recall.  So I can only
15       say that straps -- straps would have been
16       helpful for sure.
17   Q.  What working load limit would be necessary
18       on straps for the load that is at issue in
19       this case?
20   A.  You have to go to three-ninety -- you have
21       to know exactly what the weight is.  You
22       have to know what the -- what the weight of
23       the articles of cargo is.  You have to go

Page 131

1    to part 393.100 and specifically start
2    looking at straps to make that
3    determination.  Then you have to look at
4    the strap itself to make a determination if
5    it meets that working load limit
6    requirement.
7        But in general, as I stated, I -- I
8    would find it -- I'm hard-pressed to
9    believe that the motor carrier with such an
10   outstanding reputation would have just
11   taken and thrown any box of straps to the
12   driver and said, here, use these.  Can
13   I prove that, no.
14   Q.  Okay.  And you have not undertaken the
15       analysis to determine the appropriate
16       working load limit for straps in this
17       instance?
18   A.  Straps were not offered as evidence or in
19       discovery insofar as I know.
20   Q.  That wasn't my question.
21   A.  Yes, ma'am.
22   Q.  My question is -- no.  My question is
23       whether you have undertaken an analysis to

Page 132

1    determine what the working load limit would
2    be for the straps in this case.
3    A.  Again, I -- the straps were not offered
4        into evidence, so I don't have the ability
5        to -- nor is there -- there's other
6        factors -- do I have the ability to sit
7        here and offer it into evidence as
8        discovery for me to examine the straps and
9        see if they meet the requirements for the
10       working load limit of the type of cargo.
11           Did I work that up, no, because there's
12       no point in working it up if I don't know
13       what the straps are.
14   Q.  Okay.  Do you know --
15   A.  Irrespective of that, that was not the
16       seminal issue here.  What it was, is that
17       the straps that you're referring to were
18       rejected by Knauf.  And they were, you
19       know, apparently going to be using their
20       own straps, and they never did.
21   Q.  Do you know where Mr. Ross got the straps
22       that he contends he offered to Knauf?
23   A.  No, ma'am, I do not.

Video Deposition of Scott Turner

Page 133

1  Q.  Okay.  So you do not know whether Heartland

2      provided those straps to him?

3  A.  **Of course I don't know.**

4  Q.  All right.  Thank you.

5  A.  **You're welcome.**

6  Q.  All right.  I'd like to look -- we are

7      still on page 25 of your report.  I'd like

8      to ask you about opinion 7.  So if you'll

9      read that one and let me know when you're

10     ready for the question.

11  A.  **Sure.**

12      **Okay.  Sorry.  I just wanted to read it**

13      **a second time.  Go ahead.**

14  Q.  Okay.  Your opinion 7, are you stating that

15      regardless of what Mr. Ross did, it was the

16      absence of load-securement device that

17      caused the accident?

18  A.  **It was the absence of load-securement**

19      **devices that caused the accident.  That's**

20      **correct.**

21  Q.  Okay.  And so in your opinion,

22      modifications or changes to Mr. Ross'

23      behavior would not have stopped the

Page 134

1      incident?

2  A.  **One more time, please.**

3  Q.  Okay.  Do you believe that Mr. Ross, his

4      actions at Cameron Ashley, had or could

5      have had any impact on whether or not the

6      incident occurred?

7      MS. DYE:  Object to the form.

8  A.  **Based on -- based on discovery, I don't see**

9      **anything that would point in that direction**

10     **other than that we would have given a**

11     **suggestion as to it, you know, there being**

12     **a degree of responsibility by Ross.  But we**

13     **didn't find that to be evidence that would**

14     **be -- that would substantiate that.**

15  Q.  Well, so I'm trying to, then, understand

16      because your opinion 7 says that it's the

17      undersigned's opinion that regardless of

18      the scenario of which professional CMV

19      driver Ross' injuries factually derived

20      from, had Knauf complied with the industry

21      best practices by adequately securing the

22      articles of cargo within the Heartland CMV

23      semitrailer, the subject incident would not

Page 135

1      have occurred.

2      So are you saying in this opinion that

3      the actions of Mr. Ross, what he did or did

4      not do in opening the trailer door, do not

5      have an impact on whether or not the cargo

6      fell and he got hurt?

7  A.  **No.  It's --**

8      MS. DYE:  Same objection.

9  A.  **I mean, it says what it says.  I mean, I'm**

10     **not really quite sure -- so it's the**

11     **undersigned's opinion that regardless of**

12     **the scenario of which professional CMV**

13     **driver Ross' injuries factually derived**

14     **from, had Knauf complied with the industry**

15     **best practices -- so what that's saying is**

16     **that no matter how he opened up the back --**

17     **the barn doors of that semitrailer -- no**

18     **matter how he opened them up, had the -- if**

19     **he went against the policy and he just**

20     **opened them up, as you referred to a term**

21     **earlier, willy-nilly --**

22     **I think that's the first time I've ever**

23     **used that.**

Page 136

1      **-- that if he just arbitrarily opened**

2      **the doors and the articles of cargo were**

3      **secured in there, this incident doesn't**

4      **occur.  That's what that means.**

5  Q.  I believe earlier in this testimony I asked

6      you whether or not you had done a causation

7      analysis as to one aspect of your opinion.

8      Did you perform a causation analysis as to

9      any part of your opinions?

10  A.  **Other than -- other than the fact that it**

11     **was not -- the articles of cargo were not**

12     **secured by a loader that stated that he**

13     **didn't need those straps, you know, keep**

14     **them, I don't need them, I have my own, not**

15     **really, no.  There's not a lot of basis for**

16     **us to go from.**

17     **And then looking at the history.  I**

18     **look at the history of the motor carrier.**

19     **I look at the history of Knauf.  We have an**

20     **exceptional motor carrier that trains their**

21     **drivers.  Then we have a shipper where you**

22     **have -- a shipper -- Mr. Weldon, who's this**

23     **manager of the dock, that says they don't**

Page 137

1    put straps on anything.  Well, that's
2    pretty evident because every time -- not
3    every time, but often when these articles
4    of cargo reach their destination, you know,
5    a driver has got to be aware because you
6    can expect that there's a pretty reasonable
7    chance that articles of cargo are going to
8    come toppling down on top of you.
9    Q.  If a motor carrier generally trains as to
10   safety, does it mean that it has trained
11   every driver conclusively as to safety?
12   A.  Highly improbable.  Because why are they
13   going to train -- they have 1800 drivers --
14   1700 drivers.  They've got 1800 trucks
15   roughly according to SMS -- SMS, that is.
16        According to SMS, they have about 1700
17   drivers and 1800 trucks.  I doubt that they
18   trained 1,699 drivers and they left
19   Mr. Ross off the ticket.
20        It's a carrier -- a motor carrier that
21   has an exceptional safety record, and
22   because they have an exceptional safety
23   record, that leads us to believe that it's

Page 138

1    a motor carrier that would make sure that
2    all their drivers are effectively trained.
3    Q.  Okay.  So you are extrapolating that off of
4    their safety data as opposed to looking at
5    records of what Mr. Ross actually was
6    trained on?
7    A.  That's the way the Motor Carrier --
8        MS. DYE:  Object to the form.
9    A.  That's the way the Federal Motor Carrier
10   Safety Administration looks at it, too,
11   when they do a compliance audit.  They look
12   directly at this SMS data.  And they have
13   deeper data as well.
14   Q.  Have you looked at any evidence suggesting
15   that Heartland did in fact train Mr. Ross
16   as to safety in opening trailer doors?
17   A.  I think I addressed that in the beginning
18   of the deposition.  There's none insofar as
19   I know, but not to say that it doesn't
20   exist.
21   Q.  All right.  Looking on page 26 of your
22   report, I would like you to look at
23   opinion 15.

Page 139

1    A.  Okay.
2    Q.  You're ready for the questions?
3    A.  Let me read it real quick, please.  Thank
4    you.
5        Okay.  One thing I did --
6    Q.  Okay.
7    A.  -- I wanted to substitute on here, too, is
8    to strike the words "standards of care" and
9    put "best practices" in place of that.
10   Q.  The first sentence of your opinion 15
11   states:  It's the undersigned's opinion
12   that the shipper, Knauf, relied upon
13   assumptions.
14        When in your report do you list out
15   the assumptions that you believe Knauf
16   made?
17   A.  Well, Mr. Weldon clearly makes assumptions
18   because he makes an assumption that
19   articles of cargo are going to go from
20   point A to point B without cascading out of
21   the back of a semitrailer once they get to
22   the point of destination.  So that's an
23   assumption, and it's a very, very bad and

Page 140

1    dangerous assumption.  So that assumption
2    should -- should not have been taken place
3    by the shipper.  That's the assumption.
4        Then the assumption from the loader.
5    The loader -- whether he was lazy -- I
6    don't know.  I just don't know the answer
7    to that question, whether he was lazy or
8    just didn't care.  But he just loaded it
9    up -- loaded up the trailer with these --
10   with these bales of insulation, these
11   articles of cargo -- loaded up the trailer
12   and closed the doors and sealed it.
13        So I look at that and say that's an
14   assumption that those articles of cargo are
15   going to go from point A to -- I think it's
16   Codelli, Georgia, and be off-loaded there
17   or make it there safely.  That's an
18   assumption.  And assumptions are not a
19   substitute for good, sound safety
20   practices.
21   Q.  All right.  I'd like to direct your
22   attention to the top of page 27,
23   specifically your opinion 19.  If you can

Page 141

1    read that one, please.
2    A.  Okay.
3        Yes.  Okay.
4    Q.  Okay.  So opinion 19 states that it's the
5    undersigned's opinion that the incident,
6    while being an unfortunate event, the motor
7    carrier, Heartland, and therefore
8    professional CMV driver Ross, demonstrated
9    as to being a motor carrier and a CMV
10   driver that complied to the best of their
11   ability in terms of the FMCSR.
12       That is your opinion that you have
13   stated there?
14   A.  Yes.
15   Q.  Okay.  To what level does a motor carrier
16   need to comply with the Federal Motor
17   Carrier Safety Regulation?
18   A.  Well, first off, the fact that they had
19   a -- that they had a policy about opening
20   cargo -- semitrailer cargo doors, number
21   one.  That's the motor carrier.
22       Number two is that Mr. -- once again,
23   Mr. Ross offered straps knowing that his

Page 142

1    articles of cargo by regulation must be
2    secured.  So he was not given opportunity
3    to watch the live load, and he was -- he
4    just essentially had to take their word for
5    it by saying that I have my own strap -- we
6    have our own straps, we don't need yours.
7    That's an assumption, an assumption that's
8    a bad safety practice going back to the
9    prior question.
10   Q.  Does a motor carrier need to comply with
11   the Federal Motor Carrier Safety
12   Regulation, or is it okay for them to just
13   do the best they can?
14   A.  No.  They -- I can tell you right now that
15   there's not a motor carrier on the road
16   today, not one, that is completely without
17   some degree of violation.  So they all --
18   well, not all -- but many of them make best
19   efforts.  And that's reflective in the SMS
20   data that is offered on the motor carrier
21   where it clearly states that Heartland --
22   they have -- they have an exceptional --
23   the drivers are just -- I mean, they

Page 143

1    obviously love their jobs where they work
2    because they're training them to be safe.
3    And that's clear.  That's clear to me, so,
4    yeah.
5    Q.  Okay.  And if a motor carrier is found to
6    not be compliant with the Federal Motor
7    Carrier Safety Regulation, do they receive
8    some sort of citation?
9    A.  They could.  Depends on -- depends on the
10   violation.  Depends on the MCSAP --
11       THE WITNESS:  And MCSAP, ma'am, is
12       M-C-S-A-P.
13   A.  Depends on the MCSAP CVI enforcement
14   officer.  I mean, he can write a violation.
15   He could choose to write the violation
16   against the motor carrier.  He could choose
17   to write the violation against the driver
18   depending upon the violation itself.
19       So it's -- there is -- there are times
20   that Heartland -- even Heartland -- I mean,
21   you look at the SMS.  They have violations.
22   But if you have that many trucks on the
23   road, I will guarantee you, you're going to

Page 144

1    get some violations.  It's going to happen.
2    But that's why they go by percentages.
3        And it's a 24-month look back on the
4    SMS.  They look back -- they look back
5    24 months to determine violations of
6    drivers, violations of equipment.  And
7    their record -- their percentages are very,
8    very good.
9    Q.  Okay.  If you will look going back to page
10   28 of your report, under references, the
11   second bullet point is Weather Underground
12   history.
13   A.  Yes.  We always look at that.  It could be
14   sometimes significant; sometimes it's not.
15   But not significant here because we didn't
16   really post anything on it.  But we're just
17   giving you -- just letting you know that
18   we -- we look up Weather Underground
19   history on every case.
20   Q.  Okay.  So you looked at it, but it didn't
21   necessary impact your opinions that are
22   contained in your report?
23   A.  No, no, no.  It wouldn't affect our

Page 145

1   opinions at all.
2       MS. BAUGH:  All right.  If we can
3       please take about a
4       five-minute break.
5   THE WITNESS:  Sure.
6       MS. DYE:  Hey, just a reminder
7       that he has a cutoff in ten
8       minutes.
9   MS. BAUGH:  So it's 5 Eastern?
10  MS. DYE:  Yeah.
11  THE WITNESS:  5 Eastern, correct.
12  MS. BAUGH:  Okay.  Then let's make
13      it a three-minute break.
14  HE VIDEOGRAPHER:  We are off the
15      record.  The time is 3:50 p.m.
16  (A recess was taken.)
17  THE VIDEOGRAPHER:  We are back on
18      the record.  The time is
19      3:54 p.m.
20  MS. BAUGH:  All right.
21      Mr. Turner, I do not have
22      further questions for you here
23      today.  I reserve the right

Page 146

1   for us to ask you any
2   questions at any further
3   hearing or trial on this
4   matter, of course.  But for
5   today, subject to any
6   questions by plaintiff's
7   counsel, I don't have any
8   further questions.
9   THE WITNESS:  Sure, ma'am.  Thank
10      you.  And I also want to
11      reserve that if -- I
12      understand there's more
13      depositions being taken or
14      have been taken just recently
15      since the date of this report,
16      so I may have to amend or
17      supplement this report.
18  MS. BAUGH:  Okay.  Victoria, did
19      you have any questions?
20  MS. DYE:  I do.  I didn't know if
21      Pat had some.
22  MR. SEFTON:  No, I don't.
23  MS. DYE:  Okay.  Great.

Page 147

1           EXAMINATION
2   BY MS. DYE:
3   Q.  I'm going to try to make this very, very
4       fast.  But I'm going to share my screen
5       really quickly with you.  Give me just a
6       second.
7           And I am going to mark this as
8       Plaintiff's Exhibit 1.  This is -- what I'm
9       showing you -- let me know -- can you see
10      that on your screen?
11  A.  I do.
12          (Plaintiff's Exhibit 1 was marked
13          for identification.)
14  Q.  Okay.  This is Heartland's Responses to
15      Defendant Knauf's First Interrogatory
16      Requests in this case.
17  A.  Ma'am, could you make it a little bit
18      bigger by chance?
19  Q.  I sure can.
20  A.  Yes.  Thank you.
21  Q.  How's that?
22  A.  That's good.  Thank you.
23  Q.  All right.  And I clicked it out just to

Page 148

1   get quickly to the places I want to go.
2       But in number 5, Knauf asked Heartland
3   to identify Heartland's policies, training,
4   or best practices relating to checking the
5   security of loads.
6       And in the response, in part, Heartland
7   said that regarding Knauf shipments, the
8   routes or assignments are contactless for
9   Heartland drivers.  In other words, the
10  onus for loading a trailer safely and
11  responsibly and for securing that load
12  falls to Knauf.
13      My question here very briefly is,
14  number one -- well, before I ask my
15  question, let me back up and ask you this:
16  You have been working in the commercial
17  motor vehicle trucking industry for more
18  than 30 years.  Is that correct?
19  A.  That's correct.
20  Q.  And the testimony that you've given today
21  and the opinions that are identified and
22  described and listed out in your written
23  report, as you've mentioned, were, of

Video Deposition of Scott Turner

7/25/2024
38 (149 - 152)

Page 149

1    course, based on all of the evidence that
2    was provided to you to review in this case;
3    correct?
4    **A.  That's correct.**
5    Q.  And you view that evidence -- am I correct
6    in saying that you view all of that
7    evidence and formulate these opinions based
8    upon your more than 30 years of background,
9    training, and experience in the field of
10   commercial motor vehicles?
11   **A.  Yes, ma'am.**
12        MS. BAUGH:  Objection to form.
13   **A.  Yes, ma'am.  And I hate to say it, but I'm**
14   **almost coming on 40 years, so ...**
15   Q.  Okay.  So, in other words, you've got --
16   you have a lot of experience in the field
17   of trucking and commercial motor vehicles;
18   correct?
19   **A.  Yes, ma'am.  Yes, ma'am.**
20   Q.  All right.  And obviously we've talked
21   about the Federal Motor Carrier Safety
22   Regulations, and those are guidelines and
23   rules that govern this industry; correct?

Page 150

1    **A.  Correct.**
2    Q.  Outside of those written guidelines,
3    though, there are things such as what Knauf
4    references here as best practices that may
5    not necessarily be regulation in the
6    federal regs; right?
7    **A.  Correct.**
8         MS. BAUGH:  Objection to form.
9    Q.  It could be -- it could be a practice that
10   is just something that is done within the
11   industry as a whole.  Is that fair?
12        MS. BAUGH:  Objection to form.
13   **A.  That's correct.**
14   Q.  Okay.  Thank you.
15        All right.  So getting back to my
16   question here, when they ask about the best
17   practices and Heartland made this response
18   that we just read over about the onus being
19   on Knauf, do you agree with, first of all,
20   the response that Heartland put here?
21   **A.  Yes.**
22        MS. BAUGH:  Objection to form.
23   **A.  It's called contactless, and it's also**

Page 151

1    **known as in the trucking industry more of**
2    **the term no-touch freight.  So the driver**
3    **has no touch.  In other words, he just**
4    **doesn't touch it, doesn't touch the**
5    **securement, and they leave that to the**
6    **shipper, whoever is loading the CMV.**
7    Q.  Okay.  And I think you mentioned this
8    earlier, but is load securement a known
9    safety issue in this world of shipping and
10   commercial motor vehicle carrying of goods?
11   **A.  It's not just a known issue.  It's a**
12   **paramount issue.**
13   Q.  Okay.  Would this in your opinion, based on
14   your background, training, experience in
15   this world of trucking -- in your opinion
16   would the fact that Heartland says the onus
17   is on Knauf to properly secure the
18   trailers -- would that be something that in
19   your opinion would have been a known
20   industry standard when we're dealing with
21   sealed loads that the driver does not have
22   the opportunity to inspect?
23        MS. BAUGH:  Objection to form.

Page 152

1    **A.  Frequently I would say, yes.  Is it an**
2    **end-all, be-all, no, but frequently, yes.**
3    Q.  Okay.  Let me switch my screen here.  Give
4    me just a moment.
5         (Plaintiff's Exhibit 2 was marked
6          for identification.)
7    Q.  All right.  What I'm showing here and I'm
8    marking as Plaintiff's Exhibit 2 is
9    Heartland's responses to discovery that the
10   plaintiff issued in this case.
11   **A.  Can you make that a little --**
12   Q.  Yeah.  Let me scoot my screen back over.
13   Sorry.
14   **A.  There we go.**
15   Q.  So this is just, once again -- in number 4
16   we asked for the identify of all the rules,
17   regulations, and standards concerning when
18   safety devices should be used, and
19   Heartland's response was:  Heartland does
20   not load the trailer or secure the loads.
21   That responsibility falls to the shipper of
22   the product.
23        Is it common practice within the

Page 153

1    industry, based on your background,
2    training, and experience, that a carrier
3    would expect or require a shipper to ensure
4    proper load securement when dealing with a
5    sealed load that the driver does not have
6    the opportunity to watch being loaded or
7    look at before the container is sealed?
8        MS. BAUGH: Objection to form.
9    **A. Yes. It's an industry practice, and it's**
10   **pretty much a widely known practice.**
11   Q. Okay. I'm going to stop my share here
12   really quickly.
13       You were asked earlier about Mr. Ross'
14   practice of opening the doors and whether
15   or not he was given training on opening the
16   doors, and I think there was some
17   discussion about which hand was on which
18   door. But my question is this: Whether he
19   had his left hand or his right hand on the
20   door, was walking backward or forward when
21   opening the door, in your opinion would any
22   of that have mattered at all if the load
23   had been properly secured?

Page 154

1    **A. That's been my point all along. Correct.**
2    **I mean, if Knauf had taken the opportunity**
3    **to either accept the straps from Mr. Ross**
4    **or apply their own straps, this incident**
5    **doesn't happen.**
6    Q. All right. You were also asked about --
7    **A. To a high degree of probability.**
8    Q. Okay. Sorry about that. And I'm sorry I'm
9    jumping around. I'm trying to make our
10   time here -- I've got just a couple more.
11       You were asked about testimony that you
12   included in your report from Cameron Ashley
13   employees about previous issues with cargo
14   falling off of these trucks, and there were
15   some questions put to you about whether or
16   not the Cameron Ashley -- anybody at that
17   company had ever communicated those
18   concerns to Knauf.
19       I'm going to show you the last thing
20   I'm going to mark, which is Plaintiff's
21   Exhibit 3. Give me just a minute.
22       (Plaintiff's Exhibit 3 was marked
23           for identification.)

Page 155

1    Q. It's somewhat hard to read because of the
2    way that this document was copied, but I
3    tried to -- I tried to make it as big as I
4    can here. Have you seen this document,
5    these complaints?
6    **A. I believe so, yes.**
7    Q. And this, I will represent, is a list of
8    complaints specifically with relation to
9    the Lanett, Alabama, plant where Mr. Ross
10   picked up his load. And it is showing a
11   list of complaints, it looks like, starting
12   in 2019 and going all the way to the date
13   of the incident involving Mr. Ross.
14       And these are all complaints dealing
15   with load shifting, with load-securement
16   issues, with product falling out of the
17   truck, as you can see there, notations that
18   this is a safety concern here. Customer
19   has a safety concern as well as frustration
20   with ongoing problems.
21       This, again, was something that you
22   reviewed in this case; correct?
23   **A. Yes, it's something we reviewed.**

Page 156

1        MS. BAUGH: Objection to form.
2        MS. DYE: What's the objection to
3        form?
4    **A. Yeah. I said, yes, it's something that we**
5    **looked at and we took it under advisement**
6    **as we do everything.**
7    Q. Okay. And a couple of things I'm getting
8    at here: Number one, when you referenced
9    earlier -- I think you said 24 complaints.
10   Is this the document you were talking about
11   that you reviewed?
12   **A. Yes.**
13   Q. Okay. And in your opinion, based on your
14   background, training, and experience, these
15   previous complaints regarding issues --
16   repeated issues with materials not being
17   properly secured -- excuse me -- in your
18   opinion, would that have put Knauf on
19   notice that there were issues with their
20   loaders not properly loading and/or
21   securing cargo?
22       MS. BAUGH: Objection to form.
23   **A. That goes along with my additional opinion**

Page 157

1    that I added into here where I

2    referenced -- excuse me -- because of not

3    only the testimony of Todd, McGrew, and

4    Bjerke, but also those 24 complaints that I

5    referenced.

6        So you take the combination of those

7    two together -- those four things together

8    and you look and you can see it's a

9    motor -- not a motor carrier -- but a

10   shipper who wasn't taking safety seriously

11   at all, and they just continued to send

12   trucks out of their facility without

13   securement according to Mr. Weldon

14   because -- I don't remember the term that

15   he used on the form -- the specific term

16   that he used.  But, you know, he just said

17   he didn't -- it didn't warrant it or

18   something like that.

19       So that's where I came up with that

20   additional opinion that Knauf was clearly

21   put on notice based on what -- the document

22   you just showed and based on the testimony

23   of those three individuals.  They were put

Page 158

1    on notice, but they just kept on business

2    as usual.

3    Q.  Okay.  And this seems like a common-sense

4        question, but it's the last question I have

5        for you.

6        Based on your more than 30 years of

7        experience working in the trucking

8        industry, would you agree that any measure

9        of load securement is safer than the total

10       absence of any load-securement measures?

11   A.  Of course.  Of course.  You know, even if

12       they used -- any degree of securement, but

13       they just refused to.  It was just, like I

14       said, business as usual.

15           MS. DYE:  I believe that is all

16           that I have.

17           MR. GRAVES:  No questions from me.

18           Thank you.

19           THE VIDEOGRAPHER:  This concludes

20           our deposition.  The time is

21           4:06 p.m.

22       (Deposition concluded at

23           approximately 4:06 p.m.)

Page 159

1                REPORTER'S CERTIFICATE

2

3        I, Tracye S. Blackwell, a Certified Court

4    Reporter in and for the State of Alabama, do hereby

5    certify:

6        That the foregoing witness was by me duly

7    sworn;

8        That the deposition was then taken before me

9    at the time and place herein set forth;

10       That the foregoing is a complete and correct

11   transcript of the said proceedings;

12       That the reading and signing of this

13   transcript is hereby waived;

14       I further certify that I am neither of kin nor

15   counsel for any of the parties set out herein and

16   in no way interested in the results thereof.

17       Done this 5th day of August 2024.

18

19   _____

20

21   Tracye S. Blackwell, CCR, RPR
     ACCR No. 294
22   Expiration date:  9-30-2024
     Certified Court Reporter
23   and Commissioner for the State
     of Alabama at Large